UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA : | Criminal No. 06-355 (HHK) |
| v. : | |
| GUS GARDELLINI, : | |
| aka Carlos Gustavo Gardellini : | |
| Defendant. : | |

### GOVERNMENT'S MEMORANDUM IN AID OF SENTENCING

Comes now the United States, by and through its undersigned attorney, and hereby submits this Memorandum in Aid of Sentencing. Defendant's offense level under the United States Sentencing Guidelines is offense level 12 which yields an advisory Guideline range of 10 to 16 months imprisonment. The government requests a sentence within that Guideline range, deferring to the Court as to the appropriate sentence within that range.

1. **BACKGROUND**

On December 12, 2006, a one count Information was filed in the United States District Court of the District of Columbia. The Information charged one count of Filing a False Individual Income Tax Return in violation of Title 26 U.S.C. section 7206(1). Filing a false tax return carries a maximum sentence of three years incarceration, followed by one year of supervised release. Sentencing is scheduled before the Honorable Henry H. Kennedy Jr. on June 29, 2007.

2. **STATEMENT OF FACTS**

Gus Gardellini, the defendant, is a citizen of the United States. Beginning in 1998 and continuing through 2001, Gardellini, engaged in a pattern of conduct intended to evade the assessment of a substantial portion of his individual income taxes. During the prosecution years,

1

Gardellini maintained offshore bank accounts in the foreign jurisdiction of Jersey, Channel Islands which he used to conceal income. Gardellini filed false U.S. Individual Income Tax Returns for each of the respective years and conducted transactions through a nominee, Walter Anderson, and Gold & Appel Transfer, ("G&A"), Anderson's British Virgin Island Company.

Prior to tax year 1998, defendant worked for a European-based telecommunications firm, Esprit Telecom. As an employee at Esprit, he earned employee stock. Gardellini transferred his 10,000 shares of Esprit to be held by Anderson, in G&A's offshore bank account. On July 8, 1998, via e-mail communication, Gardellini directed Anderson to sell $350,000 worth of shares in Esprit for Gardellini, and wire those proceeds to Gardellini's offshore Jersey account. On July 9, 1998, $350,000 was wired from Anderson's G&A offshore account to Gardellini's offshore account. Gardellini did not report the proceeds from this stock sale, nor did he report the existence of the foreign bank account on the Schedule B of his 1998 U.S. Individual Income Tax Return.

In 1999, Gardellini did consulting work for Anderson/G&A. Gardellini, via e-mail, directed Anderson to pay for his services by directly making payments to Gardellini's American Express Card Account. Gardellini's 1999 U.S. Individual Income Tax Return was false in that Gardellini failed to report control of his foreign bank accounts, failed to report interest income earned at the foreign bank accounts, and other income items.

In 1999, Esprit merged with Global Tele-Sstems ("GTS"). As part of that transaction, Gardellini received 18,040 stock options of GTS. Gardellini communicated extensively with a Certified Public Accountant ("CPA") that he hired regarding the exercise of those options, and the tax consequences of transactions involving his stock options in GTS. Stock options are taxable on the date that an option is exercised, and his CPA advised him of this tax law. Gardellini proposed a plan to his CPA, whereby he would transfer his exercised stock options into a charitable vehicle,

and thereby, according to his plan, would avoid incurring any tax liability on the exercise of those options. The CPA explained to Gardellini that there was no way that he could avoid paying taxes once he exercised his GTS stock options. The CPA advised him that the taxable amount was determined by the difference between the market value and the option price at the date of exercise.[1] She further advised him that he would have to report the income from the exercise of the options and then, after he donated the shares of stock to the "non-profit," he would be entitled to a charitable contribution. Gardellini disagreed with his CPA's professional advice, and terminated her consultations.

On January 20, 2000, Gardellini exercised his stock options, at the price of .10 per share. On that date, the shares were trading on the public market at $26 per share. As a result of the transaction, Gardellini earned $467,236 of ordinary income that should have been reported on his 2000 U.S. Individual Income Tax Return. After Gardellini exercised his options, GTS stock lost substantial value. By December of 2000, the share price was .06875 per share. In December 2000, Gardellini sold his shares of GTS stock.

Gardellini failed to report $467,236 of ordinary income on his 2000 U.S. Individual Income Tax Return. Instead, Gardellini falsely reported a gain on his return of $10,126. He failed to report interest income earned on assets in his offshore bank account, and he failed to report income from the sale of two stocks executed through his offshore brokerage account with Barclays.[2]

---

[1] For example, assume a taxpayer was granted options originally for .01 per share. On a later date he exercises his options, the shares are trading on the public market at $10 per share. Taxable income is comprised of the difference between the price he paid to exercise the option and the trading price of the share on the date the option is exercised.

[2] In March 2000, for the first time, Gardellini obtained an Argentina passport in the name Carlos Gustavo Gardellini. Thereafter, he contacted Barclays, Jersey and informed that Bank that he was a citizen of Argentina. According to the Barclay's Financial Worksheet, Gardellini reported that he was an Argentine citizen with a country of residence of Slovakia "for tax

The 2001 U.S. Individual Income Tax Report was false insofar, Gardellini sold additional stock through his offshore brokerage account and failed to report that income. In contrast, he did report other stock transactions on his Schedule D that he consummated through his domestic brokerage accounts. In addition, in 2001, Gardellini engaged in a real estate transaction that involved his sale of a one-third share of a portion of a home he inherited with his siblings from his mother's estate. His share of the real estate was sold to a family friend, who resided in Argentina. The real estate transaction was handled by Gardellini's brother, Tony Santarelli, who is an attorney in California. The money from the alleged buyer, was transferred from Santarelli's trust account to Anderson's G&A account in the British Virgin Islands, to Gardellini's account in the Channel islands. Gardellini never reported the income earned in the real estate transaction on his tax return.

He earned a Bachelor Degree in engineering from UCLA and an MBA from the University of Hawaii. Gardellini prepared his own tax returns during 1998 through 2001. Gardellini has demonstrated an understanding of tax law. In a 2000 e-mail he authored to his brother regarding joint real estate interests maintained in California, Gardellini complained:

> the depreciation on Page 2 for the federal depreciation schedule does not match the 98 depreciation figure . . . if one assumes a straight-line depreciation with a basis of . . . with a life of . . . This needs to be corrected ASAP, as it might trigger having to file an amended return for last year. This is critical as I paid a penalty.

Gardellini's conduct was motivated by an intent to avoid taxation. In a 1997 e-mail, Gardellini stated to his brother:

> I understand that you have decided to sell everything off. Obviously you know my position in this...my only concern is limited to *the tax consequences* of dumping huge capital assets with giant equity positions and *profit into the tax coffers of the USA* . . . As to the Orchestra property, I would be in for one third . . . I am still *"in" fully from a financial standpoint,* but *it will be unofficial, and I ask to be a silent partner, with no official, documented*

purposes."

*presence* in the estate. (emphasis added)

Gardellini was a sophisticated investor. According to friends and former associates, during 1998 and 1999, Gardellini conducted a day trading business from his apartment in Miami. In an e-mail sent by Gardellini to his landlord, Gardellini complained that his rental unit was listed on the real estate multiple listing service with his personal contact information. He complained that he didn't want prospective purchasers in his apartment "where he had NASDAQ level II trading equipment" upon which reportedly spent more than $20,000. In that e-mail he stated that he resented prospective tenants asking him for trading advice, or "whether the bears were still running."

The total tax loss as a result of Gardellini's conduct during 1998 through 2001 is approximately $94,000.

3.   **PLEA AGREEMENT**

The plea agreement was entered and accepted by District Court Judge Kennedy pursuant to the terms of Fed. R. Crim. P. 11(c)(1)(B) on January 11, 2007. According to the terms of the Plea Agreement, the tax loss is greater than $70,000 but less than $120,000. The government agreed to a two level reduction for acceptance of responsibility. Defendant agreed to file corrected amended tax returns for 1998 through 2002, and pay the outstanding taxes due prior to sentencing. According to the terms of the plea agreement, defendant will file amended corrected tax returns and pay outstanding taxes due and owing to the IRS prior to the sentencing date. Assuming defendant has complied with the terms of the plea agreement, restitution should not be an issue in this case.[3]

---

[3] As part of a condition of supervised release, the Court should order defendant to pay back taxes and comply with all state, federal or local laws. See 18 U.S.C. § 3583(d); U.S.S.G. § 5D1.3(b). See also U.S. v. Braxtonbrown-Smith, 278 F.3d 1348, 1356 (D.C. Cir. 2002); U.S. v.

4.  **SENTENCING GUIDELINES COMPUTATION**

The language of the plea agreement states that the Court is obligated to calculate and consider the 2000 version of the United States Sentencing Guidelines. Section 2T1.1 of the Guidelines Manual controls sentencing for tax crimes, and requires that the tax loss resulting from defendant's conduct be computed in order to determine the base offense level by reference to Section 2T4.1 (Tax Table). As set forth above, the tax loss is greater than $70,000 and less than $120,000. According to the plea agreement, the 2000 Sentencing Guidelines dictate an offense level of 14. An agreed two-level reduction to the offense level to level 12 for acceptance of responsibility results in a sentencing range of 10 to 16 months imprisonment.

5.  **DISCUSSION**

The Court also should also consider the factors set forth at 18 U.S.C. § 3553 in determining the appropriate sentence in this case.[4] These factors include consideration of the nature and circumstances of the offense, the history and characteristics of the defendant, and the need for the sentence to reflect the seriousness of the crime and afford adequate deterrence.

---

Hatchett, 918 F.2d 631, 644 (6th Cir. 1990)(collecting cases).

[4] As this Court is aware, the district court needs to consider the goals of Section 3553 in determining the appropriate sentence, however, the court is not required to specifically refer to each factor listed in § 3553(a). See United States v. Ayers, 428 F.3d 312, 315 (D.C. Cir. 2005). Section 3553(c) provides that the court at the time of sentencing shall state in open court the reasons for its imposition of a particular sentence. Section 3553 specifically sets out the factors to be considered: (1) the nature and circumstances of the offense and the history and characteristics of the defendant; (2) the need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; afford adequate deterrence to criminal conduct; protect the public from further crimes of the defendant and provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective matter; (3) the kinds of sentences available; (4) the kinds of sentence and the sentencing range established for the . . . offense . . . as set forth in the guidelines . . . (5) any pertinent policy statement issued by the Sentencing Commission; (6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and (7) the need to provide restitution to any victims of the offense.

The tax system in the United States relies upon the voluntary compliance of each taxpayer to assess and pay their fair share of taxes into the system. The United States tax regime relies on the honor system – the truthful reporting of our citizens. For taxpayers to be motivated to pay their fair share and to be truthful, they need to believe that their neighbors and co-workers are also being truthful and paying their fair share. Taxpayers need to believe that there are substantial consequences for lying on their tax returns and not paying their fair share of taxes. To ensure respect for this voluntary system of compliance, those who do not report and pay their fair share of taxes need to be prosecuted and punished.

The criminal tax laws are designed to protect the public interest in preserving the integrity of the nation's tax system. The need to promote respect for the tax law, particularly in the arena of taxpayer use of undeclared offshore bank accounts, is great. It is estimated that Americans (individuals–not corporations) illegally evade between $40 and $70 billion in U.S. taxes each year through the use of offshore tax schemes. See "Tax Haven Abuses: The Enablers, the Tools and Secrecy," Report of the Permanent Subcommittee on Investigations, United States Senate, August 1, 2006. A strong message must be sent that the United States will not tolerate attempts to skirt tax laws through the utilization of undeclared offshore foreign bank accounts.

The government accordingly requests that the Court sentence defendant within the sentencing range under the Guidelines, as set forth above, that is 10-16 months under that calculations of plea agreement and as set forth in the Presentence Report. See United States v. Dorcely, 454 F.3d 366, 376 (D.C. Cir. 2006) ("a sentence within a properly calculated Guidelines range is entitled to a rebuttable presumption of reasonableness.") A Guidelines sentence would help serve the dual purposes of punishment and deterrence. See 18 U.S.C. § 3553(a)(2)(A) & (B). Moreover, a Guidelines sentence within the appropriate range would help further "the need to

avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." 18 U.S.C. § 3553(a)(6). As to the appropriate sentence within the Guidelines range, the government defers to the Court.

Finally, the government requests that the Court place defendant on one year supervised release following his release from incarceration. See PSR, at page 11, ¶ 51-53.

## CONCLUSION

WHEREFORE, the government respectfully requests that the Court impose a sentence within the applicable Guidelines sentencing range, and impose a period of supervised release of one year following defendant's incarceration.

Respectfully submitted,

DANA L. BOENTE
DEPUTY ATTORNEY GENERAL FOR TAX

_____
KAREN E. KELLY
Trial Attorney
Virginia Bar No. 35403
U.S. Department of Justice
Tax Division
600 D Street, NW
Washington, DC 20530
(202) 616-3864
Karen.e.Kelly@usdoj.gov