**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **UNITED STATES OF AMERICA** ) | |
| ) | **Cr. No. 06-355** |
| ) | |
| **v.** ) | **Judge Henry H. Kennedy, Jr.** |
| ) | |
| ) | |
| **GUS GARDELLINI** ) | |

## DEFENDANT'S MEMORANDUM IN AID OF SENTENCING

Defendant Gus Gardellini, through undersigned counsel, respectfully submits this memorandum in aid of sentencing. We request that the Court, after considering the totality of the record in this case, the United States Sentencing Guidelines, and the relevant factors as set forth in 18 U.S.C. § 3553, sentence Mr. Gardellini to a probationary sentence and allow him to return to Europe, where he has lived for the past two years with his wife, who is of Slovakian descent, and his one-year old son. The reasons supporting our request are set forth below.

## I.    INTRODUCTION

Gus Gardellini comes before the Court for sentencing after having pled guilty to one count of filing a false individual income tax return in violation of 26 U.S.C. § 7206(1) for the 1998 tax year, an event that took place *almost 10 years ago*. The parties have agreed that the tax loss for that offense is $76,078. As agreed, Mr. Gardellini has filed corrected and amended tax returns and already made restitution and remitted this amount to the IRS. Consequently, and in stark contrast to most tax cases, restitution is not an issue for the Court at Mr. Gardellini's sentencing. Mr. Gardellini has been and remains genuinely remorseful for his conduct. He and his family have lived under the cloud of this investigation for over three years now.

Mr. Gardellini is 46 years old.  In 2002, he married Katarina Mathernova.  They have now been married for five years.  Ms. Mathernova is a citizen of Slovakia.  She is also an attorney, having attended law school at the Comenius University Law School in Bratislava, Slovakia.  She also obtained a masters degree in law (LL.M.) from the University of Michigan in 1987.  From 1993 to 2005, Ms. Mathernova worked with the World Bank here in Washington, D.C.  In March 2005, Ms. Mathernova was appointed a Director in the European Commission. Her job is located in Brussells, Belguim, where she and Mr. Gardellini relocated two years ago.

Ms. Mathernova's family lives in Bratislava, where her father is a lawyer and served as a criminal law judge.  (Judge Mathern's letter in support of Mr. Gardellini is attached.)  In March 2006, Ms. Mathernova gave birth to their first child, Maximilian.  He is now 15 months old. Since moving to Europe and given Ms. Mathernova's busy work schedule, Mr. Gardellini has been the primary caregiver for Maximilian.

The Pre-Sentence Report, as usual, provides a comprehensive description of Mr. Gardellini's biographical background, accurately describing his upbringing, his education and his work history.  What it does not do, and what is difficult to provide the Court in the context of a limited sentencing hearing, is a description of the person.  With the advent of the Sentencing Guidelines in 1988, and their goal of injecting more consistency in the imposition of sentences for similar conduct, sentencing proceedings in federal court placed decreasing emphasis on providing the Court with a description of the individual -- an individual for whom the Court's decision on sentencing is likely to be the most significant decision in that person's life.  In our new regime, under which the Guidelines are merely advisory, defense attorneys have begun to make more efforts to describe their clients to the Court, but, at least in this attorney's opinion, not to the extent that they should.  After almost 20 years of being chilled by the mandatory

nature of the Guidelines, our Courts generally are beginning to consider a wider array of factors specific to each case and to each defendant in determining the appropriate sentence, because the law now allows the Court to do just that.

As the letters submitted by friends, relatives, and colleagues of Mr. Gardellini (attached at Exhibits 1A through 1M) help show, he is a unique individual. For lack of a more sophisticated term, he can best be described as a "free spirit," an individual who has marched to the beat of a different drummer, and who has not been constrained by the conventional lifestyles most of us know. To anyone that knows him, Mr. Gardellini has an exuberant personality, with a zest for life, and almost an adolescent naiveté in many regards. He adult life has been characterized by a peripatetic lifestyle that has taken him many different places and involved him in a wide variety of different jobs. The consistent theme characterizing his life has been his genuine love and interest in space travel and, more recently, his devotion to his new family.

The Government attempts to portray Mr. Gardellini as a sophisticated and manipulative businessman. Nothing could be further from the truth. In his various travels, Mr. Gardellini has never achieved any significant financial or material wealth; throughout the years he has lived a decidedly modest lifestyle. He has undertaken different types of jobs at different times in his life. Any modicum amount of money that Mr. Gardellini earned or saved throughout his life, he would spend in traveling or pursuing his love of space science.

II.    **FACTUAL BACKGROUND**

A.    **Gus Gardellini**

Mr. Gardellini was born in Argentina in 1961.  He came to the United States as a young child with his family.  They settled in San Pedro, California, where Mr. Gardellini was raised and went to school.  He did his undergraduate work at UCLA, and received a degree in aerospace and mechanical engineering in 1984.  In 1985, he became an American citizen.  From 1984 to 1986, he worked for Hughes Aircraft in Southern California.  In 1986, he moved to Hawaii, where he began post-graduate studies at the University of Hawaii.

In June 1988, Mr. Gardellini moved to Boston to attend the "International Space University," a 10-week program in international space studies at the Massachusetts Institute of Technology.  The International Space University ("ISU") is a highly respected program in space travel studies and science.  ISU's study programs are often sponsored by NASA.  (See Exhibit 2.)  In September, 1988, Mr. Gardellini received a certificate in Masters of Space Science.  It was at ISU that Mr. Gardellini developed his love of space travel and science.

While at "ISU," Mr. Gardellini met Peter Diamandis, who was the founder of ISU, and Walter Anderson, a major benefactor of ISU.   Mr. Anderson was reputed to be an extremely wealthy individual.  As this Court may know, Mr. Anderson recently pled guilty in this Court to tax fraud charges.  In 1988, however, Mr. Anderson and Mr. Gardellini became friends.  Mr. Anderson and Mr. Diamandis told Mr. Gardellini that they were creating a space travel company and asked Mr. Gardellini if he would work for the company.  The resulting entity, the "Space Development Corporation," was created in October 1988.  Mr. Gardellini became the Vice President of Operations in the nascent business venture at a salary of $30,000 per year.  In 1988,

4

Mr. Gardellini moved to Houston for the Company. In late 1988, the objective of the business was to create a technical plan to build a small rocket that would be capable of sending small payloads into space. Mr. Gardellini continued to work for the Space Development Corporation and several iterations of that company for the next several years. The companies, however, never met with any technical or financial success.

Toward the end of 1993, Mr. Anderson invited Mr. Gardellini to work for Esprit, Mr. Anderson's incipient European telecom company. At the time, Mr. Gardellini knew nothing about the telecom business, but needing some form of employment, he accepted Mr. Anderson's offer. In 1994, Mr. Gardellini took a job with Esprit for $42,000 a year. Part of his employment agreement entitled him to receive stock options in the company. Mr. Gardellini relocated to Europe for the job. For the next four years, Mr. Gardellini worked for Esprit and was living in London and Amsterdam. It was during this time and because he was being paid by a European company and living in Europe that Mr. Gardellini opened his "off-shore" accounts at Barclays Bank.

In 1997, Esprit sold its stock publicly. Shortly thereafter, in April 1997, Mr. Gardellini left Esprit and moved back to the United States. Mr. Gardellini left Esprit because he never advanced in the company and because it did not involve his real interest in space. For about six months in late 1997 and early 1998, Mr. Gardellini traveled around the world with a modicum amount of money he had saved.

In 1998, Mr. Gardellini moved back to the United States for the next four years, without holding a steady job. It was in 1998, while Mr. Gardellini was unemployed, that he asked Mr. Anderson to sell approximately $350,000 of Mr. Gardellini's accrued Esprit stock shares. That money was deposited in Mr. Gardellini's Barclay's account. Mr. Gardellini did not report that

income on his 1998 personal income tax return, the offense for which he is pleading guilty now. That was almost 10 years ago.

In 1998, for a period of time, Mr. Gardellini served on the Board of Directors of a non-profit foundation developed by Mr. Anderson – the Foundation for the International Non-Governmental Development of Space ("FINDS"). Mr. Gardellini never received a salary or any payments for his work with FINDS. Mr. Gardellini also conceived the idea of trying to develop his own non-profit foundation, which he referred to as TOPS. The idea, however, never got off the ground, so to speak, because the Esprit shares that were to fund the foundation became worthless.

Throughout 1998 and 1999, Mr. Gardellini was living in Miami Beach, Florida with his girlfriend at that time, renting an apartment unit that cost him $450 a month. He was unemployed for most of that time. In 2000, Mr. Gardellini decided to move to Argentina and try his luck there. After several months, Mr. Gardellini decided to return to the United States.

In 1999, Mr. Gardellini's stock options in Esprit, at least on paper, were worth several million dollars. However, in March 2000, with the advent of the meltdown in high technology stocks, his stock options became worthless. Throughout, Mr. Gardellini had entrusted his stock options to Mr. Anderson because he perceived Mr. Anderson to be an astute financial advisor. Mr. Gardellini never actually had control of his shares in Esprit.

After the technology stock market collapsed, Mr. Gardellini's Esprit stock became worthless.

In 2001, in the most significant event in his life, Mr. Gardellini met Ms. Mathernova and, with her, moved to Bratislava, Slovakia. He also closed out his offshore accounts at Barclay's Bank and transferred its balance as a wedding gift to Ms. Mathernova.

In 2002, Mr. Gardellini and Ms. Mathernova moved to Washington, D.C. where Ms. Mathernova was working with the World Bank.  As stated above, Mr. Gardellini and Ms. Mathernova were married in 2002 and, in 2005, moved to Brussels, Belgium as a result of Ms. Mathernova's new job position with the European Union.

**B.**    **The Letters Describing Mr. Gardellini**

In an effort to provide the Court with a better sense of Mr. Gardellini as a person, a number of friends and family members have submitted letters in support of Mr. Gardellini and describing the person that they know.  These are some excerpts from those letters, which are attached collectively as Exhibit 1A through 1M.

For example, Michael Potter has known Mr. Gardellini for almost 20 years.  They first met at the International Space University at MIT.  Mr. Potter speaks highly of Mr. Gardellini's expertise in the technical field, his numerous accomplishments, as well as his leadership abilities. He also remarks upon Mr. Gardellini's dedication to his family, which is further evidenced from Mr. Potter naming him as Godfather to his child.

> "Here before you, is a gentlemen, who in all of my dealings, for nearly 20 years, has always been honest, straightforward, intensely hardworking and intelligent…I am certain that Gus is filled with remorse, good faith, and wishes to move forward so he can begin contributing to all those around him."

Mr. Allen Newcomb, who also met Mr. Gardellini from the International Space University, has personally experienced Mr. Gardellini's generosity and support.  When Mr. Newcomb was struggling financially and was unemployed, Mr. Gardellini provided him with a place to stay, money, and arranged a job interview that turned into employment. Mr. Newcomb credits his present day success to Mr. Gardellini's assistance at a time when he was at his lowest.

7

Professor Vladimir Mathern, Mr. Gardellini's father-in-law, also serves as the President of the Bratislava School of Law in Bratislava, Slovakia.  Professor Mathern states the following about his son-in-law.

> "As I know Gus over the last six years, I know that his self-critical stance is genuine and that nothing similar to his past deeds will occur again the future...Due to the combination of factors – passage of time since 1998; him having fully admitted his guilt; the family life he has been leading for the past five-six years; him being a full-time caregiver to his son – I believe his rehabilitation is full and complete even without Gus having to serve a prison sentence."

Greg Whilden was Mr. Gardellini's college roommate at the University of California Los Angeles in 1981. Mr. Whilden describes Mr. Gardellini as the following:

> "Gus can best be described as Mr. Enthusiasm. He is a very energetic outgoing, and friendly person.  I feel blessed by having him as a  true and dear friend in my life…He went about setting up a charitable foundation aimed at spurring research into projects to benefit mankind."

Robert Noteboom is a close friend and business colleague of Mr. Gardellini for nearly 20 years. He speaks highly of Mr. Gardellini professionally and personally:

> "…I immediately discovered that Gus was an honest, trustworthy, and hard working individual…During all of our business dealings, I found Gus to be very professional and always on the level; someone who would carefully weigh every action and never consider taking any that would be inappropriate; and someone who could always be relied upon to treat others fairly…Gus always showed concern for the less fortunate…I have always found Gus to be a person of integrity, passionate in his beliefs, compassionate in his actions towards others, and dedicated to his family and friends."

Daniel Tani also had the opportunity to work with Mr. Gardellini in the past.   He describes Mr. Gardellini's generosity:

> "Gus is one of the most generous friends that I have.  I remember that he gave his car to his teenage younger sister when she needed transportation to get to and from school and work.  It wasn't a loan but an outright gift.  He eagerly shares his time and energy with his friends.   No favor is too big to ask for his friends and family. His dedication is perhaps his most endearing characteristic…Gus is a man of solid character, pure morals, and unquestionable integrity."

Jeremy Cavanagh knows Mr. Gardellini from the International Space University as well, and as a friend for the past 20 years. He describes Mr. Gardellini as the following:

> "I have found him to be straightforward and honest, a man who takes people as he finds them, respecting and being proactive in relating to people. He has always been conscientious in his dealings with friends and colleagues alike. These qualities, along with responsibility and commitment, are to be found expressed fully in his relationship with his wife and baby son. I have observed that he understands love to mean not putting one's self first in a family situation, a rare quality in western society."

Lucrecia Jacobson along with her husband, John Jacobson, cousins of Mr. Gardellini, appreciate all the assistance that he has provided their family with his knowledge of technology. It was because of Mr. Gardellini that Lucrecia's father was able to get a hearing aid, and he exposed the Jacobson children to technology and science.

> "The first thing that comes to mind when I think of Gus is that he was a great role model for our son and daughter as he exposed them to Space and Science and all the possibilities that life could offer through education and hard work….Gardellini is a caring nephew to my parents and introduced them to the wonders of computers and technology as none of us could…Gus believed in the advances of technology in digital hearing aides and if it were not for his caring nature, my father would never have been allowed these last years of hearing the sound of his grandchildren."

Paul Chapman who has known Mr. Gardellini since high school in 1975. Mr. Chapman fondly remembers his lifetime friendship with Mr. Gardellini, and also admires his relationship with his family:

> "Besides loyalty, integrity and strong work ethic, Gus has other qualities that are more subtle.  As my wife would tell you, that underneath that tough and critical thinking exterior is a man with a good heart that has quite a bit of sympathy to mankind and his fellow human being. I am impressed with his relationship with his wife and his willingness and ability to see things through her eyes.  From what I have seen, he has developed into a very loving father and husband and gives all to his family."

Finally, Grace Santarelli, the sister of Mr. Gardellini, recounts the difficult childhood that she and her brother endured from an abusive father.  Not only did her brother prove to be her protector in many instances, but also has given her the emotional and financial support that her parents did not provide her.

> "The Gus I know is a principled human being: he is a caring and gentle soul who has shown maturity and composure in his life…Gus was able to be a father-figure to me and role model while pursuing his college degree and advanced degrees despite all of the turmoil in our home."

## C.    Mr. Gardellini's Cooperation with the United States

In 2002, Mr. Gardellini became aware through a mutual acquaintance that U.S. authorities were investigating Mr. Anderson.  In 2004, more than three years ago, Mr. Gardellini received a grand jury subpoena from the Department of Justice in connection with the Anderson investigation.  He then retained counsel to represent him in this matter.

Mr. Gardellini's cooperation with the United States since that time has been nothing short of extraordinary.  In August 2005, after he was informed that he was a "target" of the grand jury investigation, he agreed to sit down with Department of Justice prosecutors and IRS investigators and submitted to an eight-hour interview in order to provide them with any information he had

related to Mr. Anderson as well as fully answer any questions they had about Mr. Gardellini himself or his finances.  (See Exhibit 3.)

Later in 2005, when asked by the Department of Justice to waive his attorney-client privilege with respect to a subpoena the Department issued to his prior lawyers in Florida for documents related to him, Mr. Gardellini readily agreed and waived the privilege to enable the Department to get those documents.  (See Exhibit 4.)  In March 2005, with its major prosecution of Walter Anderson occupying all of their resources, the Department of Justice asked Mr. Gardellini to toll the statute of limitations with respect to any criminal charges that might be brought against him.  In order to assist the Government and allow them to focus their efforts on what was billed as the largest tax prosecution in the country, Mr. Gardellini readily agreed.  (See Exhibit 5.)  In December 2005, Mr. Gardellini was asked a second time to toll the statute of limitations and again agreed.  (See Exhibit 6.)

As the Court knows, Mr. Gardellini entered into a pre-indictment plea agreement with the Department of Justice, acknowledging his guilt and accepting full responsibility.  Moreover, Mr. Gardellini agreed to file amended returns for the years in question and makes full restitution to the IRS *prior to sentencing in this matter.*  Mr. Gardellini has fulfilled that pledge and his amended returns have been filed and restitution has been made to the IRS in full.

Finally, long before the Government decided to charge him, Mr. Gardellini relocated to Europe.  Despite the fact that it would have been difficult for U.S. authorities to come after him and extradite him from Europe for these tax offenses, Mr. Gardellini willingly and voluntarily elected to accept responsibility, submit himself to jurisdiction in this country, and enter into a pre-indictment plea.  Several times now, he has traveled from Europe to the United States, at his own expense of course, to effectuate that plea.

**D.    The Criminal Conduct at Issue.**

Mr. Gardellini pled guilty to one count of Filing a False Individual Income Tax Return in violation of 26 U.S.C. 7206(1) for the tax year 1998.  That occurred almost 10 years ago.  It has taken the Government almost a decade to prosecute Mr. Gardellini for his conduct.  While the Government maintains that Mr. Gardellini did not report his offshore account at Barclay's Bank in three subsequent years, the amount of money that went into that account was minimal and sporadic.  The Government grossly overstates its case when it accuses Mr. Gardellini of systematically using a foreign account to evade U.S. income taxes.  Other than the $350,000 that Mr. Gardellini received in 1998 from his shares of Esprit stock and the $160,000 that he received in 2001 from his mother's estate, no significant amounts of money went in and out of that account.  Moreover, it was not an account that Mr. Gardellini established with the intent to evade taxes.  It was an account that he set up as a necessity in 1994 to allow Mr. Gardellini to receive the income he earned in Europe working with Esprit.  Had Mr. Gardellini never taken the job with Esprit, he would have never established an off-shore account.

Mr. Gardellini strongly objects to the Government's selective and distorted use of facts in its Sentencing Memorandum that portray him in an unfair light.  Through innuendo and omissions, the Government seeks to depict Mr. Gardellini's actions on a much grander scale than the facts actually support.

First, the Government unduly embellishes the fact that Mr. Gardellini had an overseas bank account, ignoring the reality that Mr. Gardellini was working overseas at the time and the Barclay's account was recommended by his employer.  The Government also attempts to inject a nefarious implication in the irrelevant story of how Mr. Gardellini opened an overseas account in

Argentina by using an Argentinian passport. The Government fails to inform the Court that Mr. Gardellini is an Argentine citizen (he has dual citizenship) and that opening an account in Argentina with an Argentinian passport while working in Argentina is not a crime, nor does it, in any way, imply criminal behavior.

Second, the Government details some of the circumstances relating to Mr. Gardellini's sale of GTS (the successor company to Esprit) stock, implying that he intentionally violated tax laws in not reporting the exercise of the GTS stock options. In fact, in discussions with defense counsel, the Government long ago agreed that Mr. Gardellini did not wilfully violate the tax laws with respect to the exercise of those stock options and the sale of this stock was not included in the plea agreement or criminal indictment. Now, the Government distorts this irrelevant issue in an effort to paint Mr. Gardellini in an unfair and undeserving pejorative light. The Government claims that Mr. Gardellini was advised by his accountant that if he exercised his stock options in 1999, he would have to report the exercise of the stock options on his 1999 tax return. The truth is that Mr. Gardellini did not exercise or sell the stock options in 1999. There is no dispute that if Mr. Gardellini had exercised his options in 1999 he would have had to report the gain on the exercise in that year. However, Mr. Gardellini's soon-to-be worthless stock options were exercised in January 2000 and sold in late 2000, as the high-tech stock bubble imploded. The reality is that instead of a half million dollar gain that would have been incurred, Mr. Gardellini had only a net $10,026 gain after the stock was sold, which he duly reported on his tax return for that year.

The Government fails to advise the Court that the IRS initially took the position that Mr. Gardellini was required to report almost a half a million dollars of *phantom* gain from the exercise of his stock options, despite the fact that they turned out to be almost worthless in less

13

than 10 months.  Not only was the Government claiming that Mr. Gardellini was legally required to report and pay taxes on this phantom gain (which would have bankrupted Mr. Gardellini), but that he was criminally liable for failing to do so.  The Government neglects to tell the Court that Mr. Gardellini's attorneys met with Department of Justice prosecutors and IRS representatives on this issue and explained how the financial news media during the stock market bust reported that stock options that were exercised and then sold in the same year could net out the gain and loss from the exercise and sale. (See Exhibit 7). The Government failed to advise the Court that based on this presentation, the Government itself agreed that it would have difficulty proving the requisite intent to violate the tax laws and the gain from the stock option exercise.  As a result, this issue was eliminated from the criminal information and the tax loss calculation under the plea agreement.  In essence, the Government is breaching the basis of the plea agreement by including this issue in a misleading fashion in the sentencing memorandum.

In addition, the government also makes an effort to unfairly label Mr. Gardellini by noting that he engaged in "day trading" during the stock market run up in 1998 and 1999.  The government fails to inform the Court that each and every one of those trades was duly reported to the IRS and all taxes with respect to this limited trading activity was paid.

Similarly, the government argues that Mr. Gardellini "has demonstrated an understanding of tax law" implying that such knowledge warrants a stricter sentence.  We respectfully disagree, as the complexities of the tax code make it axiomatic that being able to prepare your own tax return and making a comment about wanting to avoid amending a tax return and incurring a penalty does not make one an expert on the various aspects of foreign income taxation and stock option taxation referred to by the Government.

Next, the Government also refers to an unspecified amount of "consulting income," claiming that Mr. Gardellini engaged in consulting work during 1999 and failed to report such consulting income. The Government neglects to inform the Court that the consulting income amounted to a mere $4,500 and was classified by Mr. Gardellini as a reimbursement for expenses incurred during 1999. Mr. Gardellini ultimately agreed that it was wrong to misclassify the payments as reimbursement and not as income, but Mr. Gardellini did not agree in his plea agreement to allow the government to use this issue in a misleading manner that ignores the *de minimus* amount of the payment and the reason why the payment was not reported.

In a final effort to impute a nefarious motive to Mr. Gardellini, the Government takes out of context a quote from an email that Mr. Gardellini sent to his brother in 1997 with respect to a transaction having nothing to do with this case. The Government's effort misses its mark because it is not a crime to tell one's brother that he should not sell off a capital asset because it would have a large tax consequence. Perhaps the Government believes that Judge Learned Hand should have been indicted for inciting a conspiracy to avoid taxes when he opined that:

> **Anyone may arrange his affairs so that his taxes shall be as low as possible; he is not bound to choose that pattern which best pays the treasury. There is not even a patriotic duty to increase one's taxes. Over and over again the Courts have said that there is nothing sinister in so arranging affairs as to keep taxes as low as possible. Everyone does it, rich and poor alike and all do right, for nobody owes any public duty to pay more than the law demands.**

*Helvering v. Gregory*, 69 F.2d 809, 810-11 (2d Cir. 1934).

This Court should recognize that the Government's effort to overstate its case against Mr. Gardellini does not outweigh the undisputed facts that Mr. Gardellini voluntarily submitted to a full day of questioning to help the government investigate the case against Mr. Gardellini's employer, Walt Anderson, and has provided all requested information that has assisted the Government to make this case against him.

15

III.    **ADVISORY GUIDELINES SENTENCING RANGE**

Under the plea agreement and the Presentence Report writer's calculation, Mr. Gardellini's base offense level is **14** pursuant to the pertinent guideline, U.S.S.G. § 2T1.1(a)(1) given the parties' agreement that the tax loss exceeds $40,000, but is less than $120,000. The parties agree that Mr. Gardellini's base offense level should be decreased by two levels for acceptance of responsibility pursuant to U.S.S.G. § 3E1.1(a). The parties therefore agree that Mr. Gardellni's base offense level is **12**, prior to considering any departures.

We respectfully request that the Court grant a downward departure of four additional points for "extraordinary restitution and acceptance of responsibility" in light of: (1) Mr. Gardellini's ongoing cooperation with the United States as outline above, (2) his willingness to make himself available to U.S. jurisdiction despite living abroad to resolve this matter, and (3) his complete restitution prior to sentencing of any tax loss. We respectfully submit that Mr. Gardellini has made extraordinary efforts to mitigate the impact of his criminal offense through his post-conduct actions. For the reasons that follow, we request that the Court grant Mr. Gardellini an additional downward departure of four points, placing him at an offense level of **8**.

A.    **There are Special Circumstances Warranting a Downward Departure for Extraordinary Restitution.**

This Court has discretion to depart from the Sentencing Guidelines if the Court finds "there exists an aggravating or mitigating circumstance of a kind, or to a degree, not adequately taken into consideration" by the guidelines. *See* 18 U.S.C. 3553(b); U.S.S.G. 5K2.0. Before a departure is permitted, the Court must find that aspects of the case are "unusual enough for it to fall outside the heartland of cases in the Guidelines." *See Koon v. United States*, 518 U.S. 81, 98 (1996).

16

In the leading case on extraordinary restitution, the Fourth Circuit held that "restitution, although taken into account in the guideline permitting a reduction for acceptance of responsibility, can provide a basis for a departure when present to such an exceptional degree that it cannot be characterized as typical or 'usual.'" *United States v. Hairston*, 96 F.3d 102, 108 (4th Cir. 1996). Restitution may constitute a basis for downward departure where "it shows a degree of acceptance of responsibility that is truly extraordinary and substantially in excess of that which is ordinarily present." *United States v. Hendrickson,* 22 F.3d 170, 176 (7th Cir. 1994). *See United States v. Oligmueller,* 198 F.3d 669, 672 (8th Cir. 1999); *United States v. Bennett,* 60 F.3d 902, 905 (1st Cir. 1995); *United States v. Lieberman,* 971 F.2d 989, 996 (3d Cir. 1994). *See also United States v. Blakburn*, 105 F.Supp. 2d 1067 (D.S.D. 2000) (court granted downward departure to insure that restitution was made and placed defendant on a longer period of supervision in a failure to pay child support case where guidelines called for 12-18 month prison term); *United States v. Miller*, 991 F.2d 552 (9th Cir. 1993) (voluntary restitution exhibiting extraordinary acceptance of responsibility can justify downward departure); *United States v. Davis*, 797 F. Supp 762 (D.C.N. Ind. 1992) (8-level departure granted where defendant made voluntary restitution of $750,000). *See also United States v. Fagan*, 162 F.3d 1280, 1284-85 (10th Cir. 1998) (departure for extreme remorse "permissible factor" for departure if it is present to some exceptional degree); *United States v. Jaroszenko*, 92 F.3d 486 (7th Cir. 1996).

Allowing a sentencing court to depart from the Guideline range on the basis of extraordinary restitution and cooperation adheres with the Sentencing Commission's express acknowledgment that "it is difficult to prescribe a single set of guidelines that encompass the vast range of human conduct potentially relevant to a sentencing decision." U.S.S.G. ch. l,pt. A, 4(b). The Eleventh Circuit recently reaffirmed this policy, asserting that "[i]nstead of concrete

legal rules" *courts look to a range of factors, including voluntariness, efforts to make restitution, percentage of funds restored, timing of restitution, and demonstration of sincere remorse and responsibility*. *United States v. Kim,* 364 F.3d 1235, 1244 (11th Cir. 2004)(emphasis added). *See also Oligmueller,* 198 F.3d at 672; *Hairston,* 96 F.3d at 108-09; *United States v. DeMonte,* 25 F.3d 343, 347 (6th Cir. 1994); *Lieberman,* 971 F.2d at 996.

### B. Mr. Gardellini's Payment of Restitution and Cooperation with the United States was Extraordinary.

Whether a factor is present to a degree not adequately considered by the Guidelines is "... determined in large part by comparison with the facts of other Guidelines cases." *Koon, supra,* 518 U.S. at 98. An examination of the cases where a defendant's restitution was found to be extraordinary and a downward departure reinforce the conclusion a departure is warranted in Mr. Gardellini's case.

In *United States v. Kim,* 364 F.3d 1235 (11th Cir. 2004), the defendants were charged with scheming to defraud approximately $268,237 from WIC, a program directed toward providing supplemental food and nutritional assistance to women, infants, and children. *Kim*, 364 F.3d at 1238. Following indictment, plea agreements were negotiated. *Id.* On their plea date, the defendants tendered $50,000 of personal funds as partial satisfaction of restitution. *Id.* At sentencing, defendants presented a check for the remaining restitution amount, and moved for downward departure under § 5K2.0 on the basis of extraordinary restitution. *Id.* Similar to the case-at-bar, the Kim defendants obtained this money in a short amount of time. *Id.* The Kim defendants relied upon securing loans from family and friends. The Eleventh Circuit affirmed the District Court's downward departure, holding that the defendants' "payment of restitution was extraordinary enough to remove it from the heartland of cases because it demonstrated sincere remorse and acceptance of responsibility." *Id*. at 1244.

In *United States v. Bennett,* 9 F.Supp.2d 513, 516, 517 (E.D.Pa. 1998), *affirmed*, 161 F.3d 171, 178-79 (3rd Cir. 1998), the defendant, president of a charitable organization, defrauded various donors of approximately $350 million by falsely promising investors that they would double their contributions. In actuality, the defendant repaid initial investors with funds received from subsequent investors. *Id.* at 517. The defendant entered a conditional plea to 82 counts, including bank fraud, mail fraud, wire fraud, false statements, filing false tax returns, and money laundering. *Id.* at 516. Prior to sentencing, the Bankruptcy Trustee had accomplished restitution of approximately $334 million, largely through the agreement of investors who had doubled their money, to return the funds they had received. *Id.* at 519. The sentencing court held that:

> While the defendant did not demonstrate an acceptance of personal responsibility as contemplated by U.S.S.G. § 3E1.1, his close cooperation and his early turn over of the bulk of his personal and company held assets materially assisted the process of reducing the loss and occurred to an unusual degree. In these circumstances, the post-offense restitution was atypical and merited a downward departure under U.S.S.G. § 5K2.0.

*Id.* at 526 (citing *Lieberman*, supra, 971 F.2d at 995).

In *United States v. Crossey,* 1992 WL 80540 (N.D.Ill. 1992), the defendant, a bank employee, embezzled money from her employer over several years. The defendant "... ultimately informed her employer of her theft, arranged to make substantial restitution, made restitution in the amount of $145,000, and cooperated with the government, the bank, and the bank's insurance companies, in the investigation of her offense." *Id.* The district court found that the defendant's conduct constituted a reasonable basis for a downward departure. *Id.*

### C.    Mr. Gardellini's Full Payment of Restitution and Cooperation is Extraordinary and a Downward Departure is Warranted

We submit the circumstances and consequences in this case are atypical and take the case out of the guideline's heartland.  As such, a departure is warranted based on Mr. Gardellini's extraordinary efforts to cooperate with the United States as well as his full and early restitution.

As we described earlier, Mr. Gardellini's cooperation with the United States has been nothing short of extraordinary.  In August 2005, he agreed to be interviewed without limitation by the Department of Justice prosecutors and IRS investigators.  That interview lasted eight hours and it provided the Government with a wealth of information from which they continued their investigation of Mr. Gardellini.  Later in 2005, Mr. Gardellini voluntarily and willingly waived his attorney-client privilege with respect to a subpoena sent to his prior lawyers in Florida for documents related to him.  Twice, for a period of more than one year, Mr. Gardellini readily agreed to toll the statute of limitations on any prosecution against him in order to allow the Government to focus its time and resources on the major prosecution of Walter Anderson.

As the Court knows, Mr. Gardellini entered into a pre-indictment plea agreement with the Department of Justice, acknowledging his guilt and accepting full responsibility.  Moreover, while the amount of tax loss here is relatively small, Mr. Gardellini agreed to file amended returns for the years in question and makes full restitution to the IRS *prior to sentencing in this matter.*  Mr. Gardellini has fulfilled that pledge and his amended returns have been filed and restitution has been made to the IRS in full.

Finally, long before the Government decided to charge him, Mr. Gardellini relocated to Europe.  Despite the fact that it would have been difficult for U.S. authorities to come after him and extradite him from Europe for these tax offenses, Mr. Gardellini willingly and voluntarily

elected to accept responsibility and enter into a pre-indictment plea.  Several times now, he has traveled from Europe to the United States, at his own expense of course, to effectuate that plea.

Like the defendant in *Crossey*, Mr. Gardellini cooperated fully with the Government in its investigation and made arrangements to provide full restitution.

Mr. Gardellini was not criminally charged until almost 10 years after the offense conduct for the tax year 1998 and more than five years after the Government claimed that he failed to report income from any offshore bank account.  Consistent with *Oligmueller* and *Crossey*, and *Kim*, his efforts to cooperate with the Government as well as his complete restitution were extraordinary and "shows a degree of acceptance of responsibility that is truly extraordinary and substantially in excess of that which is ordinarily present." *Hendrickson,* 22 F.3d 170, 176 (7th Cir. 1994).

We believe that the law permits this Court to take into consideration the factors that we have identified above in determining whether to grant Mr. Gardellini's request for a downward departure.  The nature of these considerations is very similar to those in *United States v. Tenzer*, 213 F.3d 34, 42 (2d Cir. 2000), a tax fraud case, in which the Second Circuit stated:

> The panel in *Tenzer I*, 127 F. 3d at 227, concluded that Tenzer did not qualify for the voluntary disclosure policy because "an arrangement" to pay had not been "made" at the time negotiations with the IRS ceased and the government decided to prosecute.  That conclusion cannot be challenged by the district court. However, the court may consider certain aspects of Tenzer's case that, although irrelevant for purposes of conviction, may well be relevant for purposes of sentencing.  For instance, the court in *Tenzer I* noted that the voluntary disclosure policy is not satisfied by "mere offers to make payments."  It also noted that, for purposes of the policy, "it is irrelevant that a taxpayer intends to eventually reach an agreement," and that, therefore, "Tenzer's alleged good intentions" were not an appropriate basis for dismissal.  These factors, however, may be considered by the district judge in his evaluation of the sentence if he believes them to be "mitigating circumstances of a kind, or a degree, not adequately taken into consideration by . . . .the [sentencing] guidelines. U.S.S.G. § 5K2.O (quoting 18 U.S.C. § 3553(b)(1994).

Thus, we respectfully request that the Court grant Mr. Gardellini an additional downward departure pursuant to Section 5K2.0. We submit that an additional four-point downward departure would be appropriate under the circumstances, thus reducing the guidelines point total to *8* and allowing the Court to impose a probationary sentence.

## IV.    <u>SENTENCING UNDER *BOOKER*</u>

As the Court is well aware, the Sentencing Guidelines are no longer mandatory but, rather, they are merely advisory in the wake of the Supreme Court's holding in *United States v. Booker*, 125 S. Ct. 738, 756 (2005). Under *Booker*, sentencing courts must treat the advisory guidelines as just one of a number of sentencing factors set forth in 18 U.S.C. § 3553(a). Those statutory factors are:

1)    the nature and circumstances of the offense and the history and characteristics of the defendant;

2)    the kinds of sentences available;

3)    the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and

4)    the need to provide restitution to any victims of the offense.

### A.    <u>Application of the Statutory Sentencing Factors to the Facts of Mr. Gardellini's Case</u>

In applying the § 3553 statutory factors to Mr. Gardellini's case, a sentence below the guideline range is a just result in this matter given (1) Mr. Gardellini's lack of any criminal record, (2) Mr. Gardellini's critical contributions to his family, (3) the substantial length of time from the time of the offense to the time of prosecution, (4) Mr. Gardellini's substantial and extraordinary acceptance of responsibility and restitution; and (5) the extreme impact his offense has caused his family, both financially and emotionally.

1.    **The Nature and Circumstances of the Offense and the History and Characteristics of Mr. Gardellini Warrant a Sentence Below the Guidelines In This Case**

We have outlined in great detail earlier in the Memorandum the nature and circumstances of the offense as well as the history and characteristics of Mr. Gardellini.

This is a relatively minor tax offense that occurred almost 10 years ago.  Unlike the vast majority of tax fraud cases that involve creating an "off-shore" account, Mr. Gardellini did not establish that account for the purpose of or with the intent to commit tax fraud.  He established the account for a completely understandable and legitimate reason having to do with his employment in Europe with an European company.  After leaving that company, he maintained the account and certain funds were deposited in the account that Mr. Gardellini failed to report on his taxes.  He was wrong, but the conduct occurred years ago.  This case did not involve any deliberate and ongoing scheme to evade taxes.

Mr. Gardellini has no prior contact with the criminal justice system.  The comments of his many supporters show him to be an honest, generous and caring person.  The instant offense was committed long before Mr. Gardellini met his current wife and began to build a family, relocating to Europe for that purpose.  He has changed since this offense conduct occurred.  He is a far more mature, responsible, and stable individual now than he was 10 years ago, or even five years ago.

A sentence of incarceration here in the United States, with his wife and infant child in Europe, creates an extreme and unusual hardship for Mr. Gardellini and his family.  If his family were located here, as is true of the overwhelming number of defendants, Mr. Gardellini would be able to visit and communicate with them on a regular basis.  In this case, however, that will be impossible.  Moreover, while the Guideline range in this case allows a period of incarceration

followed by home confinement, Mr. Gardellini has no home in the United States and home confinement would be impractical.   We will not repeat it here, as we have already outlined in great detail the efforts that Mr. Gardellini made to cooperate with and assist the Government in their prosecution of him and his willingness to go to unusual lengths, not seen in vast majority of cases, to work with the Government and accept responsibility for his crime.

When the Court balances the offense conduct here against Mr. Gardellini's past life and his present life, this offense is a rather minor aberration in an otherwise impeccable and law-abiding life.

> **2.      A Sentence Below the Guidelines will Reflect the Seriousness of the Offense, Promote Respect for the Law, and Serve as Adequate Deterrence**.

In this case, given the circumstances we have described, we believe that a probationary sentence will reflect the seriousness of the offense, promote respect for the law and serve as an adequate deterrence.  The tax loss here is relatively small.  The offense occurred years ago.  Mr. Gardellini will forever have the stigma of being a convicted felon and, while that is not unique to Mr. Gardellini, that stigma alone is a form of punishment and, as such, a form of deterrence.

Mr. Gardellini made complete restitution in this case and filed amended returns prior to sentencing.  That does not occur in the majority of tax fraud cases.  Inexplicably, such efforts to make full restitution of the tax loss are not recognized by the sentencing guidelines.  If Mr. Gardellini had not had made restitution, the calculation of the sentencing guidelines in his case would be identical, and the Court would merely add the requirement of restitution as a part of his sentence.  It has tremendous benefit to the community and the promotion of compliance with the tax laws to recognize and consider that a defendant in this situation makes complete restitution prior to sentencing.  We submit to ignore these efforts will discourage defendants from making

them, thereby making the task of collection much more difficult for the Government and the Court. Recognizing Mr. Gardellini's full restitution in determining his sentence will create a positive incentive for those similarly charged to also make full restitution, a result that would be of significant benefit to our criminal justice system in tax and fraud cases.

Mr. Gardellini's other efforts at working with the United States, which are not adequately reflected in the sentencing guidelines, should also be taken into consideration by this Court in determining his sentence under 18 U.S.C § 3553. Mr. Gardellini's willingness to (1) submit to a full day debriefing at an early stage in an effort to assist the Government in its prosecution of Walter Anderson as well as in building its case against Mr. Gardellini, (2) toll the statute of limitations for the convenience and at the request of the government, (3) waive the attorney/client privilege with respect to the Government's subpoena to his attorneys, and (4) his willingness to submit to U.S. jurisdiction despite the fact that he was living abroad, are factors completely ignored by the sentencing guidelines. Yet, such cooperative conduct on the part of a defendant is tremendously significant to conserving the prosecutorial and investigative resources of the United States and of the criminal justice system in general. They should be taken into consideration in determining the sentence of any defendant, including Mr. Gardellini. Again, recognizing this extent of cooperation establishes a precedent that creates an important incentive for other defendants to go above and beyond the usual guidelines' concept of accepting responsibility, which is merely agreeing to plead guilty in a timely fashion.

Sentencing should not reflect only negative incentives that we commonly refer to as "deterrence." It should also reflect, in a more specific and comprehensive manner than conceived in the sentencing guidelines, the positive incentives that will encourage future defendants to engage in similar behavior that has a substantial benefit to the Government and to

our criminal justice system as a whole.  Applying the analysis of incentives as well as the usual disincentives in this particular case would warrant a probationary sentence for Mr. Gardellini.

      **3.**      **The Remainder of the § 3553 factors Warrant a Sentence of Below the Guideline Range**

We respectfully submit that the remainder of the §3553 factors support that a sentence below the guidelines is a just and fair sentence for Mr. Gardellini and the community.  Even under the Guidelines, his offense level is already very low and the extent of the departure necessary to impose a probationary sentence is minimal.  A probationary sentence in this case, in light of the other factors we have set forth, does not create an unreasonable disparity in Mr. Gardellini's punishment compared to other persons similarly situated.

A jail sentence is not necessary to protect the public from further crimes by Mr. Gardellini.  Mr. Gardellini has been and will continue to be a law-abiding citizen in all respects. Moreover, as we demonstrate above, a jail sentence for Mr. Gardellini is not necessary to deter others from committing the same crime.  The Tax Division of the Department of Justice complains that it is able to prosecute only a very few tax offenders and that deterrence is particularly important in tax cases.  Yet it is well known that a great many tax violators, similarly situated to Mr. Gardellini, are made subject by the IRS to only civil proceedings and penalties, not criminal penalties.

For all of these reasons, we submit that the factors set forth in 18 U.S.C. § 3553 support a probationary sentence for Mr. Gardellini even if the Court were to determine there was no basis for a downward departure form the sentencing guidelines.

**WHEREFORE,** for all the reasons set forth above, Defendant Gus Gardellini asks this Court to grant the four-point downward departure that we seek based on his extraordinary level of accepting responsibility.  In doing so, Mr. Gardellini's base offense level would be 8, which would make Mr. Gardellini eligible for probation.  Should the Court deny a departure under the Guidelines, we would submit that in balancing the factors set forth in 18 U.S.C. § 3553, a probationary sentence for Mr. Gardellini is nonetheless warranted.  We would ask the Court to sentence Mr. Gardellini to a probationary period of one year and allow him to return to Europe with his family.

Respectfully submitted,

SCHERTLER & ONORATO, L.L.P.

_____/s/_____
David Schertler
Danny Onorato
David Dickieson
601 Pennsylvania Avenue, N.W.
North Building, 9th Floor
Washington, DC  20004
Telephone:  (202) 628-4199
Facsimile:  (202) 628-4177

Exhibit 1A

Katarina MATHERNOVA

European Commission

Blvd. St. Michel 10, 1150 BRUSSELS, Belgium

The Honorable Henry H. Kennedy Jr.
United States District Court
For the District of Columbia
333 Constitution Avenue, N.W.
Washington, D.C. 20001

Dear Judge Kennedy,

I am writing this letter to ask you for a probationary sentence for my husband, Gus Gardellini.

I am a lawyer who was trained in both the Civil and Common law jurisdictions. Several years of my career were devoted to judicial reform issues in a number of countries, from Russia, through Poland, all the way to China. We used many features of the American legal system to inspire other countries striving to develop their systems. One of the primary features was the central role a judge plays in American justice, be it civil or criminal. A system that is based on a judge who is a part of an independent judiciary, a judge who listens to both sides, a judge who is impartial in his decision making. It is with my great belief in and strong admiration for your justice system that I am writing this letter to you.

You have received a number of letters in support of my husband Gus. You could read about his generous nature, about his ideals, about his devotion to his family, about his honesty and straightforwardness. All this is true and these are some of the reasons why I married him five years ago. But my letter is not meant to recount Gus's many good sides. I am writing to tell you what Gus's incarceration (or home confinement for that matter, since we live in Europe) would mean for him, for me and our son Max. I am writing to tell you why it is neither necessary, nor fair at this time. Here are my reasons:

Gus is being accused and has pled guilty to something he did in the late 1990-ies. Nine years ago. He now immensely regrets it. I would ask the Court to consider that he is a much different person today, almost a decade later.

I can vouch for the six years that we have been together. Gus has lived beyond reproach. This was the case well before the investigation began. He has been a responsible citizen, father and husband. The picture the prosecution is painting of Gus in their memorandum submitted to you is simply not true. It is misleading. They are portraying someone with a pattern of deception and a criminal mind. That is not my husband. One thing I know for sure, Gus will never ever commit a crime in the future. You will never again have a chance to see him in your Court, that I am confident of.

Over the last three years of the investigation, Gus has fully and immediately cooperated with the prosecutors. He voluntarily subjected himself to twelve hours of informal interrogation by government agents in the summer of 2005. He signed three times extensions of the statute of limitations, giving the prosecution enough time to carry out its extensive investigation. All of this happened while we lived abroad. As the prosecution points out, he is a citizen of another country and carries that passport. Nevertheless, every time the prosecution asked him, Gus traveled to the United States to be part of whatever proceeding was necessary at that time. Gus did not have to do that. He wanted to do that. He

wanted to have the investigation over, whatever the consequences, so he could bring closure to this matter and move on with his life.

The three years of investigation took a tremendous toll on our lives. It has been a true three year long punishment for all of us. An honest living hell. During this time, I have had a full time management job in the European Commission, the reason for which we moved to Europe in the first place. Since the birth of Max, Gus has been the full time care giver to him. This all has not been easy with the investigation ongoing. But we did it. In January of this year, Gus accepted responsibility for his actions of nearly a decade ago. He is now ready for you to impose his sentence.

Sentences can fulfill several goals. They can be a simple punishment, lead towards rehabilitation, act as deterrence for the person sentenced and a threatening example/deterrence to others. Given the passage of time and the above factors, I strongly believe that incarceration at this stage would mean excessive punishment for Gus. It would not bring any further benefit to the society, given my husband's acceptance of responsibility and the age of the conduct.

I respectfully ask you to sentence my husband to probation and allow him to go back home to care for our young son.

Thank you.

Katarina Mathernova

Exhibit 1B



# Bratislavská Vysoká Škola Práva

### *REKTOR*

The Honorable Henry H. Kennedy, Jr.
United States District Court
for the District of Columbia
333 Constitution Avenue, N.W.
Washington, D.C. 20001

Dear Judge Kennedy,

Let me introduce myself. I am a professor of criminal procedure and President of the Bratislava School of Law in Bratislava, Slovakia. During my professional career I also spent 25 years as a criminal judge. In 1999, I was named by the Minister of Justice of Slovakia to preside over a Recodification Commission for the Criminal Code and the Criminal Procedure Code.

During the more than six years of the Commission's work (the Codes we readopted in 2005), we used as inspiration and implementation into our law several legal concepts from the American legal system, such as "plea bargaining". As members of the Commission, we also visited the United States, met with a number of lawyers, law professors and also several judges in the Los Angeles Federal and County Courts. I know that as part of sentencing, the judge can take into account an affidavit of a trustworthy and reliable person for the conduct of the person who is being sentenced. This is especially so if the trustworthy person has the capability of further influencing the conduct of the sentenced.

I am writing this letter, Your Honor, as an offer of such an affidavit in the case of Mr. Gus Gardellini who is my son-in-law.

My daughter, Katarina Mathernova, also a lawyer by training, met Mr. Gardellini in 2001. At that time she was on a leave of absence from her then employer, the World Bank in Washington, during which she was a Special Advisor to the Deputy Prime Minister for Economic Affairs of Slovakia. After a year (during which I met Gus as well), my daughter married Gus. In 2006, she gave birth to their son, Maximilian.

To my knowledge, in 2004, American authorities started investigating Mr. Gardellini for issues related to his personal income taxes from the late 1990-ties. This led to him accepting a guilty plea in January of this year in your court.

Bratislavská akademická spoločnosť n.o.

Sídlo: Tomášikova 20, 821 02 Bratislava, Slovenská republika
IČO: 34 132 943, DIČ: 2021534392, www.vsp.sk, sk
Bratislavská vysoká škola práva, Družstevná 3, 821 06 Bratislava

Gus is now married and has a child. He has understood his past mistakes, fully cooperated with the investigators and prosecutors and admitted his guilt. As I know Gus over the last six years, I know that his self-critical stance is genuine and that nothing similar to his past deeds will occur in the future.

Due to the combination of factors -- passage of time since 1998; him having fully admitted his guilt; the family life he has been leading for the past six years; him being a full-time care giver to his son -- I believe his rehabilitation is full and complete even without Gus having to serve a prison sentence. Moreover, I truly believe that a prison sentence at this stage would cause an undue hardship for him and his family without any further benefit to the society.

I am able and willing to ensure that his future conduct is without reproach. I ask you that you take this offer into account when you hold your sentencing hearing for Mr. Gardellini on 29 June 2007 in Washington, DC.

Should you need any further information from me, my private address is: Prof. Vladimir Mathern, Marianska 8, 811 08 Bratislava, Slovakia, Europe. I can be reached at: 011 421 910 97 2336, or via my daughter and son-in-law.


Yours sincerely,


Prof. Vladimir Mathern, DrSc.

# Exhibit 1C

*Grace Ellen Santarelli, MA*
*PO Box 468*
*Garrett Park, MD 20896*
*301-646-0516*

May 31, 2007

Honorable Henry H. Kennedy, Jr.
United States District Court
for the District of Columbia
333 Constitution Avenue
Washington, D.C. 20001

Honorable Judge Kennedy,

I am writing you today to ask for your leniency in the case of my brother, Gus Gardellini. Gus pled guilty to one charge of tax evasion in December 2006.

I will admit to you that I do not know many of the details of this case. And I am completely astounded by the little I *do* know. It is impossible for me to believe that my big brother could have ever been involved in anything illegal. This is not the brother I know. I was especially shocked by his guilty plea. I would like to take this opportunity to give you some insight into Gus's character and personality to assist you in determining his sentence.

The Gus I know is a principled human being; he is a caring and gentle soul who has shown maturity and composure in his life. We grew up in a home with an extremely abusive father. I tell you this not so that you will feel sorry for him, but so that you might have insight into his true character. The threat of violence was always present. Our mother was an abused woman, at once loving and kind. She often became frightened and placating. It is an understatement to say our childhoods were unstable. Gus undertook a role as a protector of both me and my mother, at much too early an age. On more than one occasion, my father grew angry over something insignificant and raised his hand to strike my mother or myself, and Gus put himself between us.

And regardless of all of this Gus still found room in his heart to care for our father. He wanted so badly to please him and to be loved by him. He so desperately wanted a role model.

I cannot tell you how blessed I was to have Gus as my brother while growing up. When I had a problem, I turned to Gus for support. When he went away to college at UCLA, I was only nine and thought I wouldn't survive without him. But he called me often and came home to visit regularly. I remember being 14 and performing in a ballet recital, and looking out in the audience for my parents. They were not there. My father did not believe in my dancing, and my mother did not go against my father's wishes. But Gus

was there, in the front row, flowers in hand. As he was for every high school play I was in, no matter how insignificant my role.

And when it was my turn to apply for college, my father told me not to bother. He would not pay for my education because he did not believe in the education of women. But Gus did. One night I found myself sitting at the dining room table, college applications strewn about, and no money to send in with the applications. But Gus was there with me, encouraging me to apply everywhere I wanted. He proofread my college essay, helped me refine my educational goals, and gave me money for my applications. I applied to 11 universities, and was accepted to all of them. Had Gus not been there for me, I would not have even applied.

Gus was able to be a father-figure and role model to me while pursuing his college degree and advanced degrees despite all of the turmoil in our home.

I realize that Gus is about to be sentenced for failing to pay some taxes to the IRS and I understand that the Court has discretion to determine whether Gus should be incarcerated. I would ask the Court to consider that Gus is now a devoted husband and father. He and his wife have a baby named Max. Gus' top priority is to give Max the life that he had so desperately wanted. Max is 14 months old. Gus is his primary care taker. He is good at it. The bond he shares with his son is beautiful. Gus is present, and absolutely available to him. He loves his son more than anything in the world. He is a good father. An incredible father! And he so wants to be a good role model for Max.

I beseech you to have leniency on my brother. Gus is now living overseas. If he is incarcerated in the United States it will devastate his wife and his child. Please allow him a second chance. I know that he is an honorable man and will not violate the law again. I appreciate your time and consideration.

Respectfully,

*Grace Ellen Santarelli*

Grace Ellen Santarelli

# Exhibit 1D

Daniel M Tani
NASA Johnson Space Center
Mail Code CB
Houston, TX 77058

June 15, 2007

The Honorable Henry H. Kennedy Jr.
United States District Court
For the District of Columbia
333 Constitution Avenue, N.W.
Washington, D.C. 20001

Your Honor,

As a good friend of Gus Gardellini, I would like to write to you to tell you a bit about him and request compassion in his upcoming court date.

I met Gus at Hughes Aircraft Company in Los Angeles - where we both started our post-college careers. We worked closely together and became fast friends. After about 2 years, we both left Hughes to attend graduate school and pursue our different career paths. Gus is driven by the conviction that the private sector should and could compete in the space program. This conviction took him from job to job - mostly entrepreneurial ventures - but all determined to grow the fledgling private-sector space industry. I took a more conventional path in my career - but ended up with the ultimate aerospace job - I'm now a NASA astronaut. Gus and I have stayed close all these years - and although he envies my job, I ironically envy his love of space.

Gus is one of the most generous friends that I have. I remember that he gave his car to his teen-age younger sister when she needed transportation to get to and from school and work. It wasn't a loan but an outright gift. He eagerly shares his time and energy with his friends. No favor is too big to ask for his friends and family.

His dedication to family is perhaps his most endearing characteristic. Through his parents' difficult divorce, he provided physical, moral and financial support to his mother and younger sister. When he tragically lost his mother about 10 years ago, he set up a website honoring her - very rare back in those days. When we worked together, he talked about buying a special phone for his grandmother - with large buttons that he could put photographs in - because she didn't make many calls because it was too difficult to dial her small-button phone. Again, this was back when buying phones was neither commonplace nor inexpensive - I was impressed with his concern for her. Now, as a new father, it is clear that his son Max is the center of his universe.

Gus is a man of solid character, pure morals, and unquestionable integrity. I do not know the complete details of his conviction, but it is my firm belief that he is a positive contribution to our society. Removing him from society will not make the world a safer or more moral place, but it will impose great hardships on his young and growing family.

I respectfully ask you to consider these characteristics and ask for leniency when deciding Gus's fate.

Thank you for your time,

Daniel M Tani
Astronaut

# Exhibit 1E

# Robert Noteboom

21469 Glebe View Dr • Broadlands • VA • 20148
Home: 703-723-3460 • Cell: 703-623-7982 • Email: bob@noteboom.org

June 10, 2007

The Honorable Henry H. Kennedy, Jr.
United States District Court
For the District of Columbia
333 Constitution Avenue, N.W.
Washington, DC  20001

Dear Judge Kennedy:

My name is Robert Noteboom and I am writing you today regarding an individual who
has been close friend and business associate of mine for nearly 20 years; Mr. Gus
Gardellini.  By way of introduction, I am currently the Vice President of NASA Programs
for Valador, a small company in Northern Virginia, and previously served as a Vice
President at L-3 Communications where I also worked on space related programs.  For
my entire career, I have been involved in the exploration and development of space.

It is this passion for human space exploration and settlement that originally brought Gus
and me together.  As the first two employees of a small space launch vehicle start up
formed back in 1988, I immediately discovered that Gus was an honest, trustworthy, and
hard working individual.  For over two years, Gus and I worked closely together putting
in long hours on an endeavor that we hoped would be a successful business venture but
dreamed would open the space frontier to the general public.  During all of our business
dealings, I found Gus to be very professional and always on the level; someone who
would carefully weigh every action and never even consider taking any that would be
inappropriate; and someone who could always be relied upon to treat others fairly.

Gus and I became good friends when we worked together. When our business association
ended, our close friendship continued.  While we both still lived in Houston, we talked
almost daily and on many occasions, discussed his plans to help open the space frontier.
And when our conversations drifted to other social issues, Gus always showed concern
for those less fortunate than us stating that a society should be judged by how it treats its
least fortunate.  After Gus left Houston, he traveled extensively but always opened his
home to his friends no matter where he lived. When a friend was in need, he could
always counted on to do what he could to help them. And on many occasions, Gus, the
prolific writer, penned stories about his travels and his dreams for space exploration that
inspired me as I am sure it did his other friends.

Recently, Gus has married and started a family and his devotion to his wife and son are unequaled to any I have seen. You need only to observe him in action, either in person or through the stories he writes and the pictures and videos of his family that he sends to his friends, to understand how deeply he cares about his family and how dedicated he is to them.

In conclusion, I have always found Gus to be a person of integrity, passionate in his beliefs, compassionate in his actions towards others, and dedicated to his family and friends. I hope that you will take this all into consideration during your deliberations.

Sincerely,

Robert J. Noteboom

# Exhibit 1F

June, 2007

The Honorable Henry H. Kennedy, Jr.
United States District Court
For the District of Columbia
Washington, D.C. 20001

Dear Judge Kennedy:

I wish to write about Gus Gardellini whom I have known as a friend for
nearly twenty years, about what I think his attributes are as a person
and his professional contributions that I have observed him make.

I met Gus on a postgraduate course held on the campus of MIT during the
summer of 1988. He impressed me during that course with his articulate
and curious nature and the easy way he had of getting to know different
people from different countries who came from a wide diversity of
backgrounds and cultures. This summer introduction turned into an
ongoing friendship, carried out across the world, where Gus has been
generous of himself so enabling me to write this with confidence.

I have found him to be straightforward and honest, a man who takes
people as he finds them, respecting and being proactive in relating to
people. He has always been conscientious in his dealings with friends
and colleagues alike. These qualities, along with responsibility and
commitment, are to be found expressed fully in his relationship with his
wife and baby son. I have observed that he understands love to mean not
putting one's self first in a family situation, a rare quality in western society.

I'm sure you have information before you about Gus's professional
history but there are some aspects of that that I think are important to
briefly draw to your attention. Gus has a pioneering spirit and this has
benefited two high technology industries: the space industry and
international telecommunications. In the space industry Gus worked on
early efforts to commercialize, launch services (giving up a safe and
steady job to do so). This was long before it became fashionable and this
work, coupled with his talent for articulating ideas directly (e.g. put to use
by voluntarily lobbying US Congress and Senate members), I believe,
contributed to the new found acceptance of commercial space activities
amongst industry professionals and society at large, and which America
is now leading the world in.

In telecommunications his project management work in installing phone services in a newly liberalized regulatory regime across Europe helped and encouraged the European telecommunications professionals working alongside him to understand how to make the transition from a highly regulated environment to a service led regime.

It is rare to come across people who can switch between two industries at times of great change within those industries and where their personality enables them to understand the scope of change, where its heading and bring people along with them to effect that change in the workplace. Gus can. Writing this as a non-American, I am constantly surprised how people of all nationalities get on with Gus and he with them. I don't want to seem to be speaking out of turn but I think that is an attribute very much needed by America at this point in time.

In visiting Gus and his family over the past two years, I have observed how conscientiously he has sought to answer the legal requirements of this case. I have also observed the stress and strain it has had on him and his family. I have sat up with him on sleepless nights while staying with him, knowing that these few nights are but a small portion of the sleepless total. I have listened to the persistent cough that lasts across a number of my visits. I have watched this whole process wear him down.

I agree that the courts responsibility is to carry this whole process through and I am confident that this will be done in the best traditions of the American legal system. However, I would like to ask that could it be done in such a manner that Gus's attributes and talents are not diminished by the whole process and that he can continue to make an ongoing contribution to society as well as look after his family.

Sincerely,

Jeremy Cavanagh
C/O
16 St Stephens Terrace,
London, UK,
SW8 1DH.

# Exhibit 1G

Testimony for Gus Gardellini  Sentencing Hearing

June 6, 2007

Honorable Henry H. Kennedy, Jr.

Your Honor,

We are writing on behalf of my cousin, Gus Gardellini as you prepare for his sentencing hearing later this month. Allow us to present a family's perspective on Gus' character so that you may better understand the human being behind the accused defendant.

The first thing that comes to mind when I think of Gus is that he was a great role model for our son and daughter as he exposed them to Space and Science and all the possibilities that life could offer through education and hard work. My son wrote an essay about Gus a few years ago when he was given an assignment, "Who Do You Most Admire?" Gus would talk to my son about physics when they rode a roller coaster, any fun activity could become a learning experience because of Gus' love of learning. My cousin took my children to witness a historic flight of a rocket in the Mojave Dessert that most of their peers knew nothing about.

Gus Gardellini is a caring nephew to my parents and introduced them to the wonders of computers and technology as none of us could. His desire to not allow the older generation to fall behind in the ever changing digital world moved him to take my father to a specialist that allowed my father to hear clearly for the first time in many, many years. Gus believed in the advances of technology in digital hearing aides and if it were not for his caring nature, my father would have never been allowed these last years of hearing the sound of his grandchildren.

After the sudden death of his mother, my aunt, Gus made it his mission to spend as much time with his family as possible. Gus never gave material gifts, as he did not believe in attaining "things", but rather always surprised us with simple experiences, like taking the whole extended family to the movies on Christmas Day, a tradition that he kept up for many years. Presents are forgotten, but such gifts remain fond memories. When he saw that my son was having a difficult time in school one year, Gus took Ian to Florida for adventures of a lifetime – Disney World.

It is difficult to understand the complexities of the legal matter that Gus has found himself in the middle of. We believe that Gus is not a criminal, rather a victim caught in a very tangled web in the affairs of someone who supported Gus in his beliefs of commercial space for all. His simple lifestyle is proof that he did not need or require large amounts of money, only enough to live a life that included family and friends.

The last few years have been extremely difficult for Gus and his family, as the nightmare of this legal action began almost exactly at the same time Gus married the love of his life, Katarina and had a son, Max. Gus has devoted all his time and energy into his new family and has proven to be a wonderful husband and father. The torture of the loss of control of his immediate future has proven to be worse than any incarceration could give. I fear for his health if in fact he is asked to serve a long prison sentence. His mind should not be wasted, rather apply his genius in some way that he can be a benefit to our country through educating our youth with his passion.

Gus' passion for Space has taken him all over the world in the pursuit of a dream shared by many of his kind – Space Pioneers. Please consider judging Gus Gardellini as the gentle and compassionate man that does not deserve to suffer the loneliness and separation from his young family. He is not a threat to anyone, especially his country.

Respectfully yours,

Lucrecia and John Jacobson

# Exhibit 1H

The Honorable Henry H. Kennedy, Jr.
United States District Court
For the District of Columbia
333 Constitution Avenue, N.W.
Washington, D.C. 20001

June 6, 2007


Dear Judge Kennedy:

I am writing this in support of Mr. Gus Gardellini. I have a wife, Donna, of which we will soon be celebrating our 20th wedding anniversary, and three children. I am a forester/forest manager and I manage over 40,000 acres of forests for investors and I am active in the community serving on several non-profit boards. I have known Gus since 1975 when we were both freshman on the Mater Dei High School's football team and we have been good friends since. He was the best man at my wedding. My family and I were guests at his wedding in Slovakia. He has stayed several times in our home and is well liked by my two oldest children. In fact, two years ago, my oldest, James, who is now 15 years old, had to write an essay on someone he admired. He chose Gus as he saw him as someone who studied hard, worked hard, and made something of himself. Gus sets goals for himself and works hard to achieve those goals. My youngest, who is 18 months old and just about 3 months older than Gus's son, has not yet had the privilege of meeting Gus.

Gus and I have spent time together working on cars, studying for tests, trying to figure out women, and making the best of our lives. We have seen each other through good times and not-so-good times, and through all of this he has remained a loyal friend. When Gus gives you his word or commits to doing something you can be guaranteed it will be done and done well. That is why I have no difficulties writing this letter as I know that any commitment that Gus gives to you he will keep. Gus will use this experience to analyze his life, determine where changes need to be made, and improve himself. I have seen him do just this in other challenges that he has had through his life - difficult classes, challenging tasks, disappointments, past girlfriends, etc.

Besides loyalty, integrity and a strong work ethic, Gus has other qualities that are more subtle. As my wife would tell you, that underneath the tough and critical thinking exterior is a man with a good heart that has quite a bit of sympathy to mankind and his fellow human being. I am impressed with his relationship with his wife and his willingness and ability to see things through her eyes. From what I have seen, he has developed into a very loving father and husband and gives his all to his family.

His abilities and characteristics that he would bring to any community are those that all communities desire to have more of. If the opportunity ever arose, I would be delighted and honored to have him as part of the local community where I live. I know that Gus has learned from this experience and is remorseful. May this letter assist His Honor in determining that prison time would not be of any value to the community and would be a hardship on his young family. Gus can best make up for his errors to the community by reflecting on his wrongs, committing to never do it again, working hard, and being the best family man and member of the community that he can. Please contact me if I can be of further assistance.

Respectfully Submitted,


Paul E Chapman
Area Manager
The Campbell Group
461 River Ave
Eugene, OR 97404
541-393-0035 Office
541-517-0911 Cell

# Exhibit 1I

June 12, 2007

The Honorable Henry H. Kennedy, Jr.
United States District Court
For the District of Columbia
333 Constitution Avenue, N.W.
Washington, D.C. 20001

Dear Judge Kennedy:

I have known Gus Gardellini since 1981 when I was his dorm room-mate at
the University of California Los Angeles.

We have maintained close contact over the passing years.  Gus has
been a consistent traveler during those years but he has always called
Southern California his home base. This has caused him to stop by on
occasion and catch up with the family and friends, of which I am one.

Gus can best be described as Mr. Enthusiasm.  He is a very energetic,
outgoing, and friendly person.  I feel blessed by having him as a true
and dear friend in my life.

He has had an often stated goal of "getting off this rock" which
Defines what had been his passion and his main mission with regard to
"anything Space".   Unfortunately, the passing years have kept Gus
earthbound.  His zeal for becoming orbital has been replaced by
marrying the love of his life, Kata, and the recent birth of his son,
Max.  He has always proudly proclaimed that Kata was voted as the
Slovak woman of the year a few years back.

Unlike many, Gus has never been driven by money or the participation
in the rat race.  It was always on to some new adventure.   His first
stint as a young recently graduated engineer was at Hughes in El
Segundo, California.  After two years there he decided to pack up and
head to Hawaii where he went through the graduate program there and
obtained his Masters degree.  From there it was off to Space University
where he met many space co-enthusiasts.  One of these contacts later
led him to earth bound telecommunications at Esprit Telecom during
Telecom's boom years.

Unfortunately, his mom got involved in a fatal car collision.  Her
death was such a shock that Gus, in his grief, retired from that
business and hopped on a round the world cruise ship to help him deal
with her passing.  I was the real estate broker that sold his mom's
condo.  He and his brother and sister each received their one-third
share of the proceeds which enabled Gus to take some time off in his
life in order to collect himself.

Several years after retiring from Esprit, Gus informed me that his
stint there had resulted in some early options that later became quiet
a sum of unexpected paper value.  Most people would think of themselves
and how they could go about spending or saving the money for their own
needs.  Gus, however, surprised me when he went about setting up a
charitable foundation aimed at spurring research into projects to
benefit mankind.  He vested the foundation with these options.  Some
months later the telecom market went into total meltdown and his
foundation dreams never materialized as he had hoped.

Gus's current legal problem is aberrant to his otherwise good
character.  He is simply not the type of person that should be placed
in prison.  He has moved abroad to be with his family ad I would hope
that the Court would consider leniency with regard to his sentence.
Thank you for your consideration and for reviewing my thoughts and
sentiments about my good friend and my hopes that his freedom may be
maintained.

Sincere Regards,
Greg Whilden

703 Meyer Lane
Redondo Beach, CA 90278
310-529-8800

Exhibit 1J

June 6, 2007

The Honorable Henry H. Kennedy Jr.
United States District Court
For the District of Columbia
333 Constitution Avenue, N.W.
Washington D.C., 20001

Dear Judge Kennedy:


I first encountered Gus Gardellini in 1988 as part of the inaugural post-graduate class of the International Space University (ISU) held at the Massachusetts Institute of Technology (MIT). Next Summer will be the 20th year anniversary of our inaugural class.

The fact that we were able to gather over 100 highly technical people from around the world including high level delegations from China and Russia during the Cold War, represented more then a small miracle. Immediately, very few people were identified as not only being exceptionally bright, but also having leadership skills. Gus was one of the few who had the ability to effortlessly move between cultures, languages and nationalities.

After graduation, this international group of students went their separate ways. Around 1991, Walt Anderson, the other co-founder of Esprit Telecom, recruited Gus to join the company. Immediately Gus went to work planning and implementing technical centers across Europe. Gus had an impossible job, which required him to transcend astronomical growth with often unclear and conflicting management direction. Gus was somehow able to once again, technically and professionally excel. One of the classic Gus abilities was to be so clear, so direct, and so honest with those that he worked with that he uniquely was able to work with nearly any type of personality from any type of background.

In 1997, Gus was hit by tragedy when his mother was killed in horrible car accident. This shook the Gardellini family, and Gus's world. Gus reassessed his priorities in life, and promptly resigned from Esprit Telecom. And while I empathized, as best I could with his huge loss, I was really not prepared for his departure from the company. Nevertheless, over the years Gus and I grew very close to one another. He was a soul-mate and a fellow traveler, and he was a great technical guru.

I have a dear friend Katarina Mathernova, who is one of the most remarkable women on this planet. Katarina, who lived in communist Czechoslovakia, left during the cold war. She earned a one-year LLM at the University of Michigan. Even though English was her fourth language, she passed the New York bar exam on her first attempt. Katarina was an executive at the World Bank, who worked tirelessly on legal restructuring in Eastern Europe after the fall of the Berlin Wall. She helped write the Czechoslovakian constitution, and later the Slovak constitution. She worked as an attorney at Wilmer Cutler Pickering in Washington, D.C. and Sherman and Sterling in London. Currently she is an executive at the European Commission in Brussels. Well to make a long story short, my wife and I, introduced the two high achievers, and marriage soon followed. And soon after that they were blessed to become proud parents. Currently Gus plays a very important and major role in raising my Godchild Max. While Gus remains professionally active and engaged, in many ways his life has been placed in suspended animation, until these legal issues are resolved.

Shortly after their marriage, the current legal difficulties begin. While I am aware that Gus may not have paid all of his income tax, I understand that he is taking steps to correct his actions. Your Honor, I understand that you have some discretion in fashioning an appropriate sentence for Gus. Here before you, is a gentlemen, who in all of my dealings, for nearly 20 years, has always been honest, straightforward, intensely hardworking and intelligent. While Gus may have brought some baggage into his current family life, he has had to live, and cope with 5 years of this legal ordeal. It has deeply affected his on a personal and emotional level. It is inconceivable, to me, to imagine that any harsher punishment would benefit Gus, his family, or the greater community.

I am certain that Gus is filled with remorse, good faith, and wishes to move forward so he can begin contributing to all those around him. It is my sincere hope that you will be able to consider Gus Gardellini's many positive, compelling and greatly redeeming qualities.

Respectfully,

Michael Potter
Member of the Board of Trustees
The International Space University
Director
Paradigm Ventures

Exhibit 1K

June 4, 2007

The Honorable Henry H. Kennedy Jr.
United States District Court
For the District of Columbia
Washington, D.C. 20004

Dear Judge Kennedy

   I've been asked to write a testimonial for Gus Gardellini, and rather than merely spout superlatives, I think I can better help by relating this anecdote.

   In 2000, I was on the final leg of a downward spiral. I'd lost my income, lost my savings, and my house was in foreclosure. I flew from Kansas City to Los Angeles to attend an aerospace conference in a last ditch attempt to find a job. I arrived with less than $20 in my pocket and no return ticket.

   I've known Gus since we both attended the inaugural session of the International Space University at MIT in 1988. We shared a common passion for space exploration and became good friends. When we met at the LA conference, even though I hadn't gone into detail about the severity of my plight, Gus sensed it. Without being asked, he let me stay in his room and gave me $500 cash. He also talked to one of the aerospace CEO's attending the conference and asked him to give me a job interview. The interview was in San Diego, but with the $500 I was able to rent a car, and buy a plane ticket home. To pack for my new job!

   I'm now reasonably successful, with a great marriage, and it wouldn't have come about without Gus's intervention.

   I am proud to have Gus for a friend. I would ask that you consider his generosity and kindness when fashioning his sentence in this case.

Sincerely,
Allen Newcomb

# Exhibit 1L

May 30, 2007

The Honorable Henry H. Kennedy Jr.
United States District Court
For the District of Columbia
Washington, D.C. 20004

Dear Judge Kennedy:

I am writing on behalf of Mr. Gus Gardellini, whom I have known and worked with for nearly a decade. I hired Mr. Gardellini in 2004 to work as my research assistant on a book I am writing for Random House, Inc., about the team of engineers who won the coveted X Prize for private space travel.

I am an investigative reporter, formerly with the Washington Post. For the past 15 years, I have been writing nonfiction works for Random House. I am something of a cynic by nature, training and experience, and I do not trust or rely on others easily. In Mr. Gardellini's case, however, I found a person of insight, integrity, humor and perspective that is truly rare.

I first met Mr. Gardellini at industry conferences in 1999 and 2000, when he was working with nascent private space companies. I found him to have a wealth of knowledge about space entrepreneurs, but more than that, I found someone I could trust and respect. Throughout our dealings, I have been impressed by Mr. Gardellini's idealism and dedication. The nature of my work has never allowed me to offer him more than token compensation, yet he has always put in whatever effort was needed not just to fulfill his promises, but to exceed them. He is a unique person, and I have immense respect for him. He is driven -- not by worldly ambition or greed, but by his dedication to the vision of space travel as a critical step in the future of mankind. He is one of the few true idealists that I have ever worked with.

Mr. Gardellini's exceptional knowledge of aerospace and engineering has been critical to my writing; I am a bestselling author but have no expertise in the area. But more than his knowledge, I have come to depend on his judgment, integrity and dedication. I am proud to call him a colleague and a friend, someone I can call on in times of trouble or uncertainty knowing that he will be a source of wisdom, humor and compassion.

Mr. Gardellini's is someone that I trust and admire deeply. I hope this letter has provided some insight into Mr. Gardellini's character.

Very truly yours,

Joël Glenn Brenner

# Exhibit 1M

1302 E. Big Rock Rd.
Tucson, AZ 85718
June 12, 2007

The Honorable Henry H. Kennedy, Jr.
United States District Court
For the District of Columbia
333 Constitution Avenue, N.W.
Washington, D.C. 20001

Dear Judge Kennedy:

Thank you for providing me this opportunity to give you a view of Gus Gardellini.

I have known Gus Gardellini for over 25 years, and I consider him to be a great friend. We were both engineering students at UCLA, and our friendship began the day we reported to Physics 8D Lab in January of 1982. By chance, Gus and I ended up at the same two-person lab station. From the moment I met him, I knew that he was a unique individual.

Gus has always had this great love of space exploration and an ambition to be able to travel into space one day, or "to get off of this rock" as he so colorfully puts it. Whenever he talks about this subject, he simply exudes enthusiasm. Furthermore, he is not the type of person to sit by idly and watch others forge the trail. Gus has always wanted to find a way into space and to change the world by doing it.

While many people have stated great goals, very few people have the ability and desire to make any significant progress toward the end result. Gus was always one person who impressed people with his energy, intelligence, and capacity to get things done. With an eye toward his long-term goal, Gus directed his impressive qualities toward becoming an aerospace engineer. People who knew him as he worked on his engineering degree at UCLA would often express their belief in his great potential. He is a very resourceful person and that was apparent to me from the start.

I always admired Gus' ability to support himself and to make his own way through UCLA. During part of his school years, he held a job at Ford Aerospace in Newport Beach, California, working on the M247 Sergeant York DIVAD self-propelled anti-aircraft weapon system. While I knew him, Gus lived in one of the University Cooperative Housing Association buildings, where students must work to pay for part of their rent. Along the way, he took on some loans, as well, which I believe he paid back on-time, or even early. To my knowledge, he performed all of his jobs well, and I never heard of any problems about him from people who worked directly with him. In my experience, he was always a responsible, dependable, honest, and a pretty clean-living person.

After graduating from UCLA with a B.S. in Engineering, Gus took a position at Hughes Space and Communications Company where he successfully designed parts for satellites. Then, after a couple of years at Hughes, he decided to further his education by pursuing an MBA at the

University of Hawaii. Upon completion of his MBA, Gus was accepted into the elite and inaugural 1988 Summer Session of the International Space University, which was held on the campus of MIT. International Space University prides itself on creating an interdisciplinary educational program for international leaders dedicated to the development of outer space. Gus' experience at ISU catapulted him into the frontiers of private space development.

Gus' performance at ISU gave him the opportunity to join the founding team of Microsat Space Development, Inc. Microsat was a startup venture to produce a privately funded and developed space launch vehicle. Unfortunately, the company was never able to attract enough funding to produce the envisioned vehicle. Nevertheless, Gus performed his duties with the upmost integrity. I observed his role in the fundraising efforts and his actions never put his reputation into question.

Several years later, Gus joined another startup venture. In this case, it was in the telecommunication industry. However, the company, Esprit Telecom, was headed by Walt Anderson, who was known to be a big space enthusiast and a person who also wanted to find a way into space.

Now, Gus is the consummate family man. I have always known Gus to place a high regard for family. He was always the type of person to keep in close contact with and to visit often his aunts, uncles and cousins, and his brother and sister. Life now finds him exulting in his role as a loving husband with a great wife, and as a doting father with a beautiful baby boy. It is very sad and unfortunate that Gus has landed in legal trouble and that his innocent family must suffer along with him.

Through all the years I have known Gus, I have always considered him to be just a plain good guy. And to me, I still see him to be a good, and honest person, whom I can trust. I am just perplexed at how he could have let himself make the mistakes that resulted in his legal mess.

Now, all I can do is hope and pray that Gus receives the best and most optimistic legal outcome. I feel that he has learned a lot from this experience and that he will do everything possible to follow the right path and to avoid ever having problems again. I know that he is trying to find some good out of this by using his experience to preach a message of being sure you are always doing the right thing.

Again, thank you very much for taking the time for considering my thoughts. I very much appreciate the opportunity.

Sincerely,


Christopher Capurro

**National Aeronautics and Space Administration**

+ Text Only Site
+ en Español
+ Non-Flash Version
+ **Site Help & Preferences**

**FIND IT @ NASA**

+ ABOUT NASA    + LATEST NEWS    + MULTIMEDIA    + MISSIONS    + MY NASA    + WORK F[

+ NASA Home
+ ARC Home

+ NASA Home > **Centers** > Ames Home > News > **Releases** > **2007**

Print This    [

**Ames Research Center**

+ CENTER HOME

+ ABOUT AMES

− AMES NEWS

+ MULTIMEDIA

+ RESEARCH

+ MISSIONS

+ AMES EVENTS

+ AMES HIGHLIGHTS

+ EDUCATION

+ DOING BUSINESS WITH US

SEARCH

+ GO

NEWS RELEASES

Sonja Alexander                                                    Ma[
Headquarters, Washington
202-358-1761

Michael Mewhinney
NASA Ames Research Center, Moffett Field, Calif.
Phone: 650-604-3937/9000

Caroline Ritter
International Space University, Illkirch-Graffenstaden, France
+03-88-65-54-55

**RELEASE: 07_09AR**

**NASA Ames to Host International Space University Summer Session**

MOFFETT FIELD, Calif. - NASA announced on Wednesday that the International Space Unive[
Summer Session Program in 2009 will be held at the Ames Research Center, Moffett Field, Ca[

Key factors in the center's selection were Ames' location in Silicon Valley, its world-class scient[
its ongoing collaborations with academia and the entrepreneurial space community.

"Our Ames Research Center location will provide the International Space University's diverse s[
body a rich interdisciplinary curriculum along with the mentorship of NASA's scientists, enginee[
researchers, as well as our academic and industry partners," said NASA's Assistant Administra[
Education Joyce Winterton.

The International Space University was established in 1987 as an institution founded on the vis[
peaceful, prosperous and boundless future through the study, exploration and development of[
the benefit of all humanity. The summer session program is an intense nine-week course for
postgraduate students and young professionals.

"This is the first time in the program's history that this prestigious summer session will be held [
center, and I'm very proud that we will have a key role in developing future leaders in the globa[
community," said Ames Research Center Director S. Pete Worden.

"The selection of NASA Ames Research Center as the site for Summer Session Program 2009[
more noteworthy since the competition attracted the largest selection of outstanding proposal[
20-year history of the International Space University. We have no doubt that the students who [
Summer Session Program 2009 will be accelerated on their way to becoming leaders in the sp[
sector," said Dr. Michael Simpson, president of the International Space University.

Approximately 120 students from all over the world will participate in the summer session. An[
international cadre of distinguished professors will teach the classes. The curriculum covers th[
space-related fields, both technical and non-technical, and ranges from engineering, physical s[
and satellite applications to life sciences, policy, management and humanities. The summer se[
from mid-June to August 2009.

With this program, NASA continues its investment in the nation's education programs to streng[
future workforce of NASA and the nation. Through this and the agency's other college and univ[
programs, NASA will identify and develop the critical skills and capabilities needed to achieve t[
for Space Exploration.

For more information about the International Space University, visit:

http://www.isunet.edu/

For more information about NASA and agency programs, visit:

http://www.nasa.gov

- end -

text-only version of this release

To receive Ames news releases via e-mail, send an e-mail with the word "subscribe" in the subject line t
releases-request@lists.arc.nasa.gov  To unsubscribe, send an e-mail to the same address with "unsubs
subject line.

NASA Image Policies

+ Freedom of Information Act
+ Budgets, Strategic Plans and Accountability Reports
+ The President's Management Agenda
+ Privacy Policy and Important Notices
+ Inspector General Hotline
+ Equal Employment Opportunity Data Posted Pursuant to the No Fear Act
+ Information-Dissemination Priorities and Inventories
+ USA.gov
+ ExpectMore.gov



Editor: Jonas Dino
NASA Official: Brian Dunbar
Last Updated: April 21, 2007
+ Contact Ames
+ SiteMap



U.S. Department of Justice

Tax Division

*Northern Criminal Enforcement*

601 D Street N.W.
Washington, D.C. 20002

July 8, 2005

David Schertler, Esquire
Coburn & Schertler LLC
1140 Connecticut Ave NW
Suite 1140
Washington, DC 20036

      Re:  <u>Proffer of Gus Gardellini</u>

Dear David:

    As you know, by letter dated January 5, 2005 your client Mr.
Gardellini was informed that he was designated a target of a
grand jury sitting in the District of Columbia.  Your client has
agreed to participate in an "off-the-record" debriefing.  We have
scheduled that meeting for Tuesday August 2,  2005.  In the
language below, I have set forth the Government's ground rules of
this and any subsequent **voluntary** "off-the-record" debriefing
with your client.

    (1)  First, except **as provided** for **in** paragraphs two and
three below, no statements made by or other information provided
by your client during the **voluntary** "off-the-record"
debrief~~ing~~(s) will be used directly against your client in any
criminal proceeding.

    (2)  Second, the Government may make derivative use of and
may pursue any investigative leads suggested by any statements
made by, or other information provided by, your client.  Because
any statements made during this "off-the-record" debriefing are
voluntarily made on the part of your client, rather than
compelled, it is the government's position that <u>Kastigar</u>
protections do not apply.  Nevertheless, your client understands
that based on the terms of this agreement there will be no
<u>Kastigar</u> hearing at which the government would have to prove that
the evidence it would introduce at trial is not tainted by any
statements made by or other information provided by your client.

    (3)  Third, in the event your client is ever a witness at
any trial or presents evidence through other witnesses and your
client's statements or that evidence contradicts statements made
in your client's debriefing, the attorney for the Government may

cross-examine your client and other witnesses concerning any statements made or other information provided by your client during the "off-the-record" debriefings. Evidence regarding such statements may also be introduced in rebuttal. This provision is to assure that your client does not abuse the opportunity for a **voluntary** "off-the-record" debriefings, does not make material false statements to a government agency, and does not commit perjury when testifying at a trial or another judicial proceeding.

(4) Fourth, it is understood and agreed to by your client and the United States that this agreement and the debriefings conducted pursuant to this agreement does not constitute  plea bargaining sessions. However, if this agreement or the debriefings conducted pursuant to this agreement are subsequently construed as plea bargaining sessions, your client knowingly and voluntarily waives or gives up any rights your client has pursuant to Rule  410 of the Federal Rules of Evidence and Rule 11(e)(6) of the Federal Rules of Criminal Procedure. In the absence of your client's waiver, these rules might prohibit the use of your client's statements and information provided by your client in accordance with the provisions set forth in paragraphs two and three above.

(5) Your client also understands and agrees that this debriefing agreement does not obligate the Government to enter into any future plea bargain with your client or to file any motion regarding cooperation provided by your client. In addition, your client understands that this office has made no additional promises to your client not contained in writing herein.

I trust that you will find these ground rules fair and reasonable. Please have Mr. Gardellini review this letter. Afterwards, would you and your client both sign this letter where indicated below. Please bring the signed original to our meeting on August 2, 2005. If you have any questions, please do not hesitate to call me at (202) 616-3864.

Sincerely yours,

KAREN E. KELLY
Trial Attorney

SUSAN SACHSMAN
Trial Attorney

## CLIENT ACKNOWLEDGMENT

I have read every word of this debriefing agreement, and its meaning has been fully explained to me by my attorney.  After consultation with my attorney, I understand and agree to the contents of this letter.

_____1 AUG 2005_____
Date

_____
GUS GARDELLINI

## ATTORNEY'S ACKNOWLEDGMENT

I acknowledge that I have read each page of this debriefing agreement, reviewed it in its entirety with my client, and discussed fully with my client each of the provisions of the agreement.

_____8-1-05_____
Date

_____
DAVID SCHERTLER

$\int_{0}^{0}$ SCHERTLER & ONORATO, L.L.P.

| David Schertler | Alexander H. Bopp | Mark E. Schamel |
| *DC & IL Bars* | *NJ & NY Bars* | *DC & MD Bars* |
| Danny C. Onorato | Lisa Fishberg | Vanessa Sophir |
| *DC & CA Bars* | *DC & NY Bars* | *DC & VA Bars* |
| | Habib F. Ilahi | Brian A. Stanton |
| | *TX Bar* | *CA Bar* |
| | Carroll Crumbaugh Love | Michael Starr |
| | *DC & MD Bars* | *DC Bar* |



November 4, 2005

**HAND FACSIMILE (202 310-5555) AND FIRST CLASS MAIL**

William E. Buchanan, Esq.
Carr Maloney, P.C.
1615 L Street, N.W.
Suite 500
Washington, D.C.  20036-5652

Dear Mr. Buchanan:

This is to confirm that I represent Gus Gardellini and that Mr. Gardellini agrees to waive any possible privilege he has pertaining to documents in the possession of Babione, Kuehler & Caslow.  Please feel free to call me if you have any questions.

Sincerely,

David Schertler



COBURN & SCHERTLER, L.L.P.

| Barry Coburn | Alexander H. Bopp | Mark E. Schamel |
| *DC, MD & VA Bars* | *NJ & NY Bars* | *DC Bar* |
| David Schertler | Lisa Fishberg | Michael Starr |
| *DC & IL Bars* | *DC & NY Bars* | *DC Bar* |
| Danny C. Onorato | Carroll V. Crumbaugh Love | Meredith A. Taylor |
| *DC & CA Bars* | *DC & MD Bars* | *DC & VA Bars* |



March 18, 2005

**VIA FIRST CLASS MAIL**

Karen E. Kelley, Esq.
United States Department of Justice
    Tax Division
P.O. Box 972, Ben Franklin Station
Washington, D.C.  20044

     RE:   ***Gus Gardellini***

Dear Karen:

    Enclosed please find the original of the "Limited Waiver of Statute of Limitations" executed by Mr. Gardellini and his counsel.

    Please fee free to call me if you have any questions.

                         Very truly yours,

                         David Schertler
                         COBURN & SCHERTLER, LLP
                         1140 18th Street, N.W.
                         Suite 1140
                         Washington, D.C.  20036

enclosure

March 8, 2005

## LIMITED WAIVER OF STATUTE OF LIMITATIONS

I, GUS GARDELLINI, have been fully advised by my attorneys that the U.S. Tax Division is conducting a grand jury investigation against me concerning alleged violations of Title 26 United States Code, Sections 7201, 7206(1) and (2); Title 18 United States Code Section 371; and Title 31 United States Code section 5314, relating to alleged false returns for tax years beginning in 1998.

I desire that an indictment against me not be immediately sought by the government prior to December 31, 2005, so that the government may have an opportunity to evaluate information and evidence presented by my attorney, and so my attorney may meet with representatives of the Tax Division to negotiate a satisfactory disposition of this case. Accordingly, I hereby expressly waive any right of defense provided by any statute of limitations relating to any violation of federal criminal law for an additional period of time from present until December 31, 2005.

I understand that this waiver will allow the government, at any time on or before December 31, 2005, to obtain an indictment against me for any criminal offense which is not time-barred as of March 8, 2005. I further understand that this waiver in no way prohibits the government from seeking any indictment against me after December 31, 2005 for those offenses which are not otherwise time-barred. Furthermore, I understand that the government may do additional investigation after the date of this waiver in order to fully evaluate the information or evidence provided by attorney.

I have discussed this matter with my attorney, David Schertler, Esq., and David Dickieson, Esq., and I fully understand the meaning and consequences of the above waiver. No promises, representations, or inducements of any kind, other than those stated herein, have been made or offered to me or, to my knowledge, to my counsel or any other person in connection with this waiver.

_____          8 MAR 05
Gus Gardellini                       Date Signed

_____
David Schertler, Esquire

_____
David Dickieson, Esquire



**U.S. Department of Justice**

Tax Division

*Northern Criminal Enforcement*

---

P.O. Box 972, Ben Franklin Station
Washington, D.C. 20044
(202) 514-5150

November 17, 2005

**VIA FEDERAL EXPRESS**

David Schertler, Esq.
Coburn & Schertler
1140 Connecticut Avenue, N.W.
Suite 1140
Washington, D.C. 20036
(202) 628-4199

    Re: Gus Gardellini Statute Extension

Dear Mr. Schertler,

    Attached please find the statute extension as we discussed on the telephone Tuesday. Please review it with your client for his signature, and return a copy by fax and the original with signatures, as soon as possible.

    If you have any questions regarding this matter, please don't hesitate to contact me.

               Regards,

               Karen E. Kelly
               Trial Attorney

               Susan Sachmans
               Trial Attorney

               Tax Division, Criminal
               US Department of Justice

.att

November 17, 2005

## LIMITED WAIVER OF STATUTE OF LIMITATIONS

I, GUS GARDELLINI, have been fully advised by my attorneys that the U.S. Tax Division is conducting a grand jury investigation against me concerning alleged violations of Title 26 United States Code, Sections 7201, 7206(1) and (2); Title 18 United States Code Section 371; and Title 31 United States Code section 5314, relating to alleged false returns for tax years beginning in 1998.

I desire that an indictment against me not be immediately sought by the government prior to December 31, 2006, so that the government may have an opportunity to evaluate information and evidence presented by my attorney, and so my attorney may meet with representatives of the Tax Division to negotiate a satisfactory disposition of this case.  On March 8, 2005, I executed a Limited Waiver of Statute of Limitations through December 31, 2005, and after consultation with my attorneys, wish to extend this extension. Accordingly, I hereby expressly waive any right of defense provided by any statute of limitations relating to any violation of federal criminal law for an additional period of time from present until December 31, 2006.

I understand that this waiver will allow the government, at any time on or before December 31, 2006, to obtain an indictment against me for any criminal offense which is not time-barred as of March 8, 2005.  I further understand that this waiver in no way prohibits the government from seeking any indictment against me after December 31, 2006 for those offenses which are not otherwise time-barred.  Furthermore, I understand that the government may do additional investigation after the date of this waiver in order to fully evaluate the information or evidence.

I have discussed this matter with my attorney, David Schertler, Esq., and David Dickieson, Esq., and I fully understand the meaning and consequences of the above waiver.  No promises, representations, or inducements of any kind, other than those stated herein, have been made or offered to me or, to my knowledge, to my counsel or any other person in connection with this waiver.

Gus Gardellini                          Date Signed


David Schertler, Esquire


David Dickieson, Esquire

November 17, 2005

## LIMITED WAIVER OF STATUTE OF LIMITATIONS

I, GUS GARDELLINI, have been fully advised by my attorneys that the U.S. Tax Division is conducting a grand jury investigation against me concerning alleged violations of Title 26 United States Code, Sections 7201, 7206(1) and (2); Title 18 United States Code Section 371; and Title 31 United States Code section 5314, relating to alleged false returns for tax years beginning in 1998.

I desire that an indictment against me not be immediately sought by the government prior to December 31, 2006, so that the government may have an opportunity to evaluate information and evidence presented by my attorney, and so my attorney may meet with representatives of the Tax Division to negotiate a satisfactory disposition of this case. On March 8, 2005, I executed a Limited Waiver of Statute of Limitations through December 31, 2005, and after consultation with my attorneys, wish to extend this extension. Accordingly, I hereby expressly waive any right of defense provided by any statute of limitations relating to any violation of federal criminal law for an additional period of time from present until December 31, 2006.

I understand that this waiver will allow the government, at any time on or before December 31, 2006, to obtain an indictment against me for any criminal offense which is not time-barred as of March 8, 2005. I further understand that this waiver in no way prohibits the government from seeking any indictment against me after December 31, 2006 for those offenses which are not otherwise time-barred. Furthermore, I understand that the government may do additional investigation after the date of this waiver in order to fully evaluate the information or evidence.

I have discussed this matter with my attorney, David Schertler, Esq., and David Dickieson, Esq., and I fully understand the meaning and consequences of the above waiver. No promises, representations, or inducements of any kind, other than those stated herein, have been made or offered to me or, to my knowledge, to my counsel or any other person in connection with this waiver.

Gus Gardellini

David Schertler, Esquire

David Dickieson, Esquire (DS)

1 DEC 05
Date Signed

<u>Tech Workers' Stock Options Turn Into Tax Nightmare</u>

Copyright 2001 Los Angeles Times  13 April 2001

Finances: With IRS bills greater than plummeting stocks' values,
employees seek legislative relief.

By LIZ PULLIAM WESTON, P.J. HUFFSTUTTER and JON HEALEY, Times Staff Writers

Thousands of technology workers are facing huge tax bills by Monday's income tax filing deadline because of company stock they purchased last year that has since plummeted in value.

Accountants and politicians from Silicon Valley to Boston say they have been inundated with horror stories about shares purchased with employee options that workers once had hoped would make them rich. Instead, employees are saddled with big tax bills on profit they never saw.

Many of these workers now owe far more in taxes than their stock is worth. Former Cisco engineer Jeffrey Chou, 32, owes $2.5 million in taxes on company stock he purchased last year that has since withered in value. Chou figures that if he were to sell everything he owns, including the three-bedroom Foster City, Calif., townhouse that he shares with his wife and 8-month-old daughter, the family still could not pay the bill.

I've lost sleep.  I can't eat. I cannot pay, and we're ruined," Chou said.

The one thing sustaining Chou is a small but growing movement among the financially devastated workers to try to change the rules that snared them. But the issue is an uphill battle legislatively because of a widespread perception that the victims were done in by their own greed or bad planning: In essence, they played the option lottery and lost.

This is not the most politically compelling story," said one congressional staffer.

Many of the affected workers, however, said they believed they were doing the right thing by exercising options and then hanging on to the stock instead of selling it for quick profit. Some did not understand the tax implications of their stock purchases, and many said they wanted to show loyalty to their companies.

"There was this feeling of 'hold on to it for the long term,'" said Marilynn Goldberg, an unemployed Redwood City, Calif., executive recruiter who faces a $500,000 tax bill from Portal Software Inc.  stock she purchased using options last year. Shares of the Cupertino,  Calif.-based company have fallen more than 80% since then.

"You have to remember, it's a new phenomenon," she said. "A lot of the people [using options] had never had them before."

What also rankles is the idea that top management may have escaped this pain. Accountants say some companies have allowed their executives--although not typically their rank-and-file workers--to cancel stock purchases made last year if the shares subsequently declined. The Securities and Exchange Commission has said the practice is legal, but told companies they must record an expense that will lower their reported profit. In addition, the companies must disclose the cancellations in future annual reports. So far, no companies have made such cancellations public.

Portal Software and Cisco say they are not among the companies that rescinded executive stock sales.

"We do not undo stock transactions after the fact," said Cisco spokesman Steve Langdon.

There are two kinds of options that companies use to reward workers: incentive options and the more common nonqualified options. Incentive options can trigger an especially nasty trap for the unaware or the unprepared. Buying stock with these options triggers the alternative minimum tax, or AMT, a parallel tax system Congress devised to make sure the rich don't completely avoid taxes. Former Cisco engineer Jeffrey Chou says even if he sold the house he shares with wife Cindy and baby Cassie, he couldn't pay his taxes.

Chou used incentive stock options to buy about 100,000 Cisco shares last year, paying 5 to 10 cents for each share. At the time, Cisco stock was trading between $60 and $70 a share. The difference between the price he paid and what the shares were worth--about $6.9 million--is taxable to him as profit, even though he never sold the shares.

Under the AMT, the first $175,000 of Chou's taxable income is taxed at a federal 26% rate, and any amount over that is taxed at 28%. Add in state taxes, and the bill is $2.5 million.

Chou could sell his shares now, but it wouldn't solve his problem. Cisco closed Thursday at $17.98 a share, which means that his stake is worth about $1.8 million. To pay his state and federal tax bill, he needs an additional $700,000.

Federal tax law offers an out to those who used incentive options to buy stock last year, but only if the shares were sold before Dec. 31. The employee would still owe taxes, but only on the difference between what the employee paid for the stock and what it was worth on the day they sold. What's more, they would have the money to pay the bill, thanks to the stock sale.

The problem is that some tech workers didn't hear about the loophole in time to sell their shares. Others said they didn't believe their stock would fall so far that they wouldn't be able to sell it by the tax deadline to pay their bill.

That group includes Chou and many of his friends who used incentive options.

"We had faith in Cisco. They were so stable," Chou said. "I thought this sort of thing only happens to people at dot-coms, not to engineers at Cisco."

Cisco spokesman Langdon said the San Jose Internet networking equipment maker tries to prepare its employees for the tax implications of options by holding seminars, referring workers to the company's stock administration department and advising them to seek professional tax help.

Chou and two fellow Cisco engineers, who also face crippling tax debt, have hired a tax attorney to help them deal with the Internal Revenue Service. As tales of tax burdens become more common, Chou and his friends have been contacted by other Cisco employees who, in turn, have tipped them to more people facing the problem. The group is starting to rally people online, using their site www.reformAMT.org to gather stories and organize.

Employees from several tech companies gathered at a popular Mexican restaurant in Santa Clara, Calif., on Thursday to swap ideas and attorneys' names. A business development manager, who said he hasn't had a peaceful night's sleep in months, has spent thousands of dollars on accountants "who still don't have any answers for me."

Many of the workers are calling themselves bankrupt, but filing for bankruptcy may not be an option. Tax debt is difficult to wipe out, even in a Chapter 7 liquidation, and usually the tax bills must be at least 3 years old. Meanwhile, the IRS may try to collect.

"The waiting period sometimes just kills people," said Charles Rettig, a Beverly Hills tax attorney.

The workers have other options, IRS officials say. They can arrange installment payments to pay their tax bills over time. Or they can throw themselves on the mercy of the IRS and attempt to settle their tax debts for less than what they owe in what is known as an "offer in compromise."

Unfortunately, the IRS offer-in-compromise system is overloaded, and negotiations can drag on for more than a year, lengthening the time these workers will spend in financial limbo. There are no plans to move stock-option users to the head of the line. "They'll be treated like anyone else" in the program, an IRS spokesman said.

Some tax experts fear the big bills will induce some workers to stop paying taxes altogether. Robert L. Sommers, a San Francisco tax attorney and editor of the Tax Prophet Web site, told a Senate hearing he feared that some workers would "slip out of the system"--either leave the country or fail to file their returns.

Some types of stock-option transactions are not reported to the IRS, so even workers who know they have a tax problem might try to pretend it doesn't exist, accountants said. That fact raises no small amount of bitterness among Chou's friends.

"We're trying to do the moral thing and pay our taxes. Look where it's gotten us," said Jaweed Mahmud, 36, a business development manager at Cisco who said his tax bill is in the six-figure range.

Technology workers aren't the only ones facing AMT problems. Because Congress didn't index the AMT system for inflation, a growing number of middle-income Americans have been snared by the alternative tax in recent years. The growth of incentive stock options has made the problem worse.

The congressional Joint Tax Committee estimates that 1.5 million taxpayers will be hit by the AMT this year, and that number is expected to skyrocket over the next decade.

"The AMT is getting more and more out of whack," said Rep. David E. Price (D-N.C.). "It was designed for relatively rare instances where one was escaping tax liability altogether. . . . The AMT is beginning to affect people whom it was never intended to affect."

Members of Congress say there is strong bipartisan support for reforming the alternative system, but that support might not extend to helping technology workers specifically.

Rep. Zoe Lofgren, a Democrat who represents part of the Silicon Valley, and 13 other House Democrats from technology-heavy districts introduced a bill to exclude incentive stock-option plans from the AMT. The bill, which would be retroactive to Jan. 1, 2000, is awaiting action in the Ways and Means Committee. The problem, congressional experts say, is that the issue hasn't hit taxpayers in many parts of the country. The bill may draw little interest from districts that haven't profited handsomely from the high-tech explosion, which created plenty of Internet millionaires to go along with the current crop of AMT victims.

Supporters of the bill argue that the victims aren't rich people. "A lot of them are young, recent graduates," Lofgren said. "Some of them have been downsized, and in addition to being downsized and having their stock completely tank and be worthless, now they're being taxed on income they never had."

Times staff writer Charles Piller contributed to this report.
Copyright 2001 Los Angeles Times

Two Kinds of Stock Options

With both incentive stock options and the more common nonqualified options, taxes are based on the difference between the low price the employee pays for the stock and its actual value on the day the stock is purchased.

Nonqualified options: The paper profit is reported to the IRS and included in workers' W-2 forms. Workers who purchased the shares and didn't immediately sell them risk watching the stock price decline--but still pay tax based on their phantom profit. Usually, most of the tax has been withheld. Incentive stock options: The tax is more insidious, because it only applies if the taxpayer is subject to the alternative minimum tax (AMT). The paper profit isn't counted for normal income tax purposes and no tax is withheld. There's even a tax incentive to hanging on to the shares--the growth can qualify for favorable capital gains rates if the shares are held for more than a year. The better the deal for the employee who bought stock under incentive options, the more likely the extra value will trigger the AMT, a parallel tax system Congress devised to make sure the rich don't completely avoid taxes.

Under AMT rules, not only are the paper profits counted as taxable income, but a variety deductions--including state taxes and some kinds of mortgage interest--are disallowed.

-- LOS ANGELES TIMES